FILED

2020 Jul-13  PM 01:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MATTHEW T. WINTHER, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:18-CV-1693-RDP** |
| | } | |
| **UNITED STATES STEEL** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on (1) Defendant United States Steel's Motion for Summary Judgment (Doc. # 19); (2) Defendant's Motion to Exclude the Testimony of James J Connors (Doc. # 17); (3) Defendant's Motion to Exclude the Testimony of Chris Johnson (Doc. # 18); and (4) Defendant's Motion to Strike the Declaration of Matthew Winter (Doc. # 29). The Motions have been fully briefed. (Docs. # 19-1, 22-28, 32-34). After careful review, and for the reasons discussed below, Defendant's Motion for Summary Judgment is due to be granted, which renders Defendant's other motions moot.

I.      **Background**[1]

The Preserve is a 325-acre mixed use development in Hoover, Alabama, developed by U.S. Steel. (Doc. # 16-11 at 3). The City of Hoover approved the development. (Doc. # 16-9 at 21). As part of the approval process, the City required a presentation about the development's master drainage plan. (Doc. # 16-9 at 28-29). The City required more specific engineering plans for each phase of the development, including detailed analyses and descriptions of any drainage features. (Doc. # 16-9 at 23-25, 52). U.S. Steel prepared the required plans and received approval from the City, indicating that the plans complied with City of Hoover regulations. (Doc. # 16-9 at 44, 55; Doc. # 16-11 at 2; Doc. # 16-10 at 2). Development of The Preserve began in 1998, and physical construction began in 2000. (Doc. # 16-15 at 22–23[2]; Doc. # 16-12 at 2).

U.S. Steel retained Walter Schoel Engineering, Inc. ("Schoel Engineering") to develop the master drainage plan for The Preserve. (Doc. # 16-3 at 20). The focus of the plan was Hurricane Branch, which experienced flooding that had impacted existing developments in Hoover long before The Preserve's development. (Doc. # 16-9 at 26–27). The central component of the master drainage plan was the installation of an undersized culvert at an upstream location, creating significant inline over-detention of stormwater flows. (Doc. # 16-9 at 25–27). The City of Hoover accepted and approved the plan and the Federal Emergency Management Agency

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Here, in their Response to Defendant's Motion for Summary Judgment, Plaintiffs did not dispute any of the facts listed as undisputed by Defendants. (*See* Doc. # 27 at 4-14; Doc. # 8 at 14 ("The first section [of an opposition brief] *must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts.* [] All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.")(emphasis in original)).

[2] The court's citation to deposition testimony corresponds to the actual deposition page number. When citing to other documents, the court cites to the court-filed page number.

(FEMA) approved the undersized culvert's installation. (Doc. # 16-2 at 23). The culvert has been successful in reducing peak flows in Hurricane Branch by 15% to 35%, depending on the particular storm event. (Doc. # 16-9 at 27).

By 2007, the majority of The Preserve's development was complete. (Doc. # 16-12 at 2). Within The Preserve 105 lots had been developed, and in the neighboring subdivision, Highland Crest (which is not affiliated with U.S. Steel), 21 lots had been developed. (Doc. # 16-15 at 44; Doc. # 16-12 at 2).

Hurricane Branch flows through three undeveloped lots adjacent to The Preserve, which were eventually purchased by the Winthers (the "Winther Property"). (Doc. # 16-16 at 100-101). The Winther Property is in a ravine, with Hurricane Branch at the bottom of the ravine. (Doc. # 16-8 at 40 ("Q. So the creek is in the bottom of a valley or ravine? A. Correct, naturally formed."); Doc. # 16-9 at 152). The Winther Property slopes steeply upward to Flintshire Drive on its eastern side, and slopes steeply upward to The Preserve on its western side. (Doc. # 16-9 at 151-52; Doc. # 16-18).

The previous owners of the Winther Property were David Rawson and his brother. (Doc. # 16-16 at 34-35). Rawson initially purchased and subdivided the property, intending for homes to be built on Lots 1 and 3, leaving Lot 2 vacant in between. (Doc. # 16-16 at 34-35; Doc. 16-17). Rawson, who was also a developer, arranged for the construction of driveways crossing Hurricane Branch on Lots 1 and 3, either without cost or at reduced cost, and worked with builders with whom he had a professional relationship in doing so. (Doc. # 16-13 at 35, 47 ("Well, when you draw subdivisions, which is what I did a lot of back then, contractors really like to be your friend.")). Rawson had building pads "cut in" on Lots 1 and 3. (Doc. # 16-13 at 56–57). Rawson did not obtain permits from The Corps of Engineers or FEMA for the work

performed in Hurricane Branch, he sized the culverts "on a scratch pad," and he understood that the stream crossings would flood under certain conditions. (Doc. # 16-13 at 40 ("My theory was that if it went underwater, it just went underwater and I would stay on which side of the culvert I was on.")).

In 2007, while still residents of Arizona, Plaintiffs Tracey and Matthew Winther bought the three lots on the Winther Property for the total purchase price of $145,000. (Doc. # 16-16 at 8, 13-14, 19).[3]

Before purchasing the Winther Property, Mr. Winther was aware the Property was in a floodplain of Hurricane Branch. (Doc. # 16-16 at 34 (He and Rawson "had conversations about exactly where the floodplain was and where the building sites were and the creek crossings and it – you know, that's as far as the concern went. There were good answers by someone who seemed to know about these things.")). The Winthers performed no investigation of the driveways or creek crossings prior to purchase. (Doc. # 16-16 at 53–54).

When the Winthers eventually relocated to Hoover, Alabama, in late 2010, they rented a house, anticipating that they would build a home. (Doc. # 16-16 at 26). However, other than a few preliminary inquiries, the Winthers have never taken any concrete steps toward building a home on the Winther Property. (Doc. # 16-16 at 43). For example, they have not sought a building permit. (*Id.*). Moreover, the Winthers were not successful in securing financing from a lender to build a house due to their financial condition. (Doc. # 16-16 at 21–22). They rented different properties until they purchased a house somewhere else in mid-2018. (Doc. # 16-16 at 7, 27).

---

[3] The street addresses for the three lots are 3412 Flintshire Drive, 3414 Flintshire Drive, and 3418 Flintshire Drive. (Doc. # 16-16 at 14).

Although the Winthers contend increased flows from The Preserve are precluding them from developing Lot 1, the Winthers agree that none of those concerns have prevented them from building on Lot 3. (Doc. # 16-16 at 163).

Stormwater runoff flows downhill from The Preserve to Hurricane Branch through a natural drainage way on the Winther Property. (Doc. # 16-9 at 183-84; Doc. # 16-12 at 2). The drainage way is adjacent to the driveway on Lot 1, passes the building pad on Lot 1, and empties into Hurricane Branch immediately adjacent to the Lot 1 stream crossing, on the downstream side. (Doc. # 16-9 at 183-84; Doc. # 16-12 at 2). This drainage way is referred to as "Tributary 1." (Doc. # 16-at 13-14; Doc. # 16-18).[4]

In 2013 and 2014, only seven additional lots were developed in The Preserve, and the road crossing above the Winthers Property was piped for stormwater flow. (Doc. # 16-12 at 3).

In mid to late 2014, while visiting the Property, Mr. Winther observed what he believed were increased flows down the drainage way, Tributary 1, during rain events. (Doc. # 16-16 at 59–61 ("So, there was just a lot more water coming down. And so this caused me to investigate why there was suddenly more water coming down this little tributary that, you know, like I said, I – I understood it to be a ditch….")). Mr. Wither associated the increased water flows during rain events with an increased rate of erosion of Tributary 1. (Doc. # 16-16 at 59-61 ("And, you know, it had eroded a lot around the time of that event.")).

Mr. Winther complained to U.S. Steel, the City of Hoover, the Alabama Department of Environmental Management, and the Corps of Engineers, asserting Tributary 1 was experiencing increased stormwater flows and erosion. (Doc. # 16-16 at 69, 83–84. On March 17, 2015, a meeting was held at the City of Hoover's offices to discuss Mr. Winther's concerns. (Doc. # 16-9 at 93-94). The City Engineer, Rod Long, Mr. Winther, representatives from U.S. Steel, and

---

[4] Tributary 1 is the more southerly dashed blue line.

Walter Schoel, III, from Walter Schoel Engineering, attended the meeting. (Doc. # 16-16 at 129–131).

During the meeting, Schoel explained that it was Schoel Engineering's view that increased flows from The Preserve were not causing increased erosion to Tributary 1. (Doc. # 16-9 at 94–95). Rather, in Schoel's professional opinion, the construction of the driveway and building pad on Lot 1 had impinged on and narrowed the natural drainage way, channelizing and increasing the velocity of stormwater flows. (Doc. # 16-9 at 94–95). The Hoover City Engineer, Long, agreed with Schoel's assessment. (Doc. # 16-9 at 95 ("Q. Do you have an opinion about whether encroachment of the building pad fill into the tributary created an issue with erosion? A. Yes, sir. I think it contributed to the erosion.")).

U.S. Steel offered to armor Tributary 1, by the driveway and stream crossing where the increased erosion was observed. (Doc. # 16-16 at 132). However, Mr. Winther did not believe the proposed armoring "was an acceptable resolution to the problem."  (Doc. # 16-16 at 133, 135 ("I indicated that I didn't think this was a reasonable solution, and that was sort of the end of the conversation.")).

Although Schoel Engineering did not believe the erosion in Tributary 1 was attributable to increased stormwater flows from The Preserve, it nevertheless began researching other possibilities for reducing flows down Tributary 1. (Doc. # 16-3 at 82-83). Schoel ultimately suggested collecting a significant portion of flows that had been directed to Tributary 1 and re-routing them to another drainage feature entirely on U.S. Steel's property that emptied to Hurricane Branch at another location upstream of the Winther Property. (Doc. # 16-3 at 82-83; Doc. # 16-9 at 125). In October 2015, when it approved the Phase XIV preliminary plat package,

the City of Hoover approved Schoel Engineering's plan to re-route the stormwater flows. (Doc. # 16-9 at 174-75).

The Winthers filed this lawsuit in October 2017. (Doc. # 1-1). Mr. Winther says his first concern (relevant to this case) is the erosion of Tributary 1 next to the driveway on Lot 1. (Doc. # 16-16 at 151-52 ("[W]ell, at current makes the driveway a bit unstable and perhaps dangerous or treacherous and eventually will probably make it impassible.")). Mr. Winther believes the condition of the driveway prevents construction on Lot 1 because of potential future access issues. (Doc. # 16-9 at 153). He is also concerned about increased flow rates in Hurricane Branch. (Doc. # 16-9 at 152 ("So that impacts our property in that we are along Hurricane Branch and if there becomes wide-scale known flooding problems, then it possibly makes the property less desirable, especially if they are causing damage to the property.")).[5]

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The

---

[5] Mr. Winther summarized his claim as follows:

Q.      So, again, today, just sitting here today, if everything else remained constant, the concern is that the tributary that has eroded, correct?
A.      Yes.
Q.      And the increased flow rate in that tributary?
A.      Yes.
Q.      And the increased flow rate in Hurricane Branch?
A.      Yes.
Q.      And none of those things have prevented you from building a house on Lot 3, correct?
A.      Correct.
Q.      Okay. And you believe those things have prevented you from building a house on Lot 1?
A.      Yes. … Because if we build a house on the pad on Lot 1, we may not have a driveway to get to the house.

(Doc. # 16-9 at 162–63).

party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

The Winthers' First Amended Complaint contains five claims: (1) "Count One – Common Law Water Claim"; (2) "Count Two – Trespass"; (3) "Count Three – Nuisance"; (4) "Count Four – Negligence/Wantonness"; and (5) "Count Five – Injunction." (Doc. # 1-1 at 34-36).

### A.   The Common Law Water Claim

The entirety of Count One, the Common Law Water Claim, reads as follows:

11.   Alabama law recognizes a common-law right of a lower property owner not to be injured by the interference of an upper property owner with the natural drainage of water onto the lower property.

12.     Defendants have unlawfully interfered with the natural drainage of water from The Preserve onto the Winther Property resulting in damage to the Winthers.

Wherefore, Plaintiffs demand compensatory and punitive damages from Defendants in an amount to be determined by a jury, plus interest and costs.

(Doc. # 1-1 at 34).

Defendant argues that the Winthers "did not plead their first count, a 'common law water claim,' sufficiently to state a claim for relief under Alabama law [because] [u]nder the common-law rule, surface water is regarded as a 'common enemy' and a landowner may restrict or control such water in any way he deems necessary to protect his land, regardless of injury to adjacent property." (Doc. # 19-1 at 11 (citing *King v. Adams*, 349 So. 2d 611, 614 (Ala. Civ. App. 1977)). The Winthers argue that they have properly presented such a claim because "[a]n upper proprietor may be held liable under Alabama law when it 'channels surface water onto the property of a low proprietor, when it otherwise would have been scattered and diffused, any by doing so causes damage to the lower proprietor.'" (Doc. # 27 at 14-15 (citing *Johnson v. Washington*, 474 So. 2d 651, 653 (Ala. 1985)). In its Reply, Defendant argues that the Winthers did not plead a separate channelization claim. (Doc. # 28 at 7 (citing *Smith v. Family Dollar Stores, Inc.*, 2017 WL 6597933, *3 (N.D. Ala. 2017) ("improper channelization is not merely a passive exception to the common enemy rule but is, rather, a separate cause of action.")).

Both the Preserve and the Winther Property are within the City of Hoover. (Doc. # 16-11 at 3; *see also* (Doc. # 27 at 12-13). "In Alabama, the general rule regarding surface water within incorporated cities and towns is the 'common enemy doctrine,' which entitles the owner of the upper, or higher elevated, property to divert surface water from his property as a 'common enemy.'" *Smith*, 2017 WL 6597933 at *3 (citing *Deckle v. Vann*, 182 So. 2d 885, 887 (Ala. 1966)). "'[I]n doing so[, the upper owner] may build walls, or dams to prevent the water flowing onto his heritage.'" *Smith*, 2017 WL 6597933 at *3, (quoting *Deckle*, 182 So. 2d at 887)

(alteration in original). As the Alabama Supreme Court has explained, when all the property at issue in a case lies within the municipal limits of a city, the defendant is "entitled to divert the water on its property without regard to the effect that diversion will have on [the plaintiff's] property." *Purser v. Solid Ground Dev., Inc.*, 45 So. 3d 1249, 1252 (Ala. 2010)); *see also Bailey v. Floyd*, 416 So. 2d 404, 404 (Ala. 1982) ("Each land owner has an unqualified right to divert the surface waters without incurring legal consequences while other landowners possess the duty and right to protect themselves from the effects of the diversion.").

However, Alabama law provides what has been described as a limited exception to the common enemy doctrine:

> A significant exception was made to the common law rule prevailing in cities in *Kay-Noojin Development Co. v. Hackett*, 253 Ala. 588, 45 So.2d 792 (1950), to the effect that an upper proprietor who collects surface water into a channel and casts it upon the property of the lower proprietor is liable for damages even though the property is in an incorporated city or town. Thus, in cities the lower owner may dam or barricade surface water, but the upper owner may not channelize it so as to injure the lower owner.

*Mitchell v. Mackin*, 376 So. 2d 684, 686 (Ala. 1979).[6]

Plaintiffs cite *Johnson v. Washington*, for the proposition that this "exception" applies here, despite the fact that they did not plead a channelization claim. In *Johnson*, a channelization claim "was not specifically set forth in the Washingtons' complaint." 474 So.2d 651, 653 (Ala. 1985). Nonetheless, the court allowed a channelization claim to go forward, citing *Sargent v. Lambert Construction Co.*, 378 So.2d 1153, 1155 (Ala.Civ.App. 1979). *Johnson*, 474 So.2d at 653. A respected member of this court has addressed this very argument. This court agrees with Judge Kallon's rejection of *Sargent*, as set forth in *Smith*:

> In *Sargent*, the Alabama Court of Civil Appeals held that the trial court erred in granting judgment in favor of the defendant on the plaintiff's negligence and

---

[6] This explanation in *Mitchell* is dicta because the property at issue in that case was "outside a city or town." *Mitchell*, 376 So. 2d at 686.

trespass claims (the only claims set forth in the complaint), because the "facts clearly showed plaintiff's right of recovery under the law applying to changing of the natural flow of surface water to the injury of a lower property owner." 378 So. 2d at 1155. The court explained that, "regardless of the use of the terms 'negligence' and 'trespass' by plaintiff in its statement of claim, it sufficiently stated a claim for relief and gave defendant fair notice thereof." *Id*.

*Sargent* is unfortunately not helpful to the plaintiffs. As an initial matter, the *Sargent* court characterized its holding as a matter of Alabama "civil procedure," pursuant to which the court had a "duty" to "grant the relief to which the evidence show[ed] the parties [were] entitled." *Id*. Federal courts are of course not bound by state procedural rules, but must instead follow the Federal Rules of Civil Procedure. *See Cohen v. Office Depot, Inc*., 184 F.3d 1292, 1296 (11th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)) ("Federal courts sitting in diversity are required to apply state substantive law and federal procedural law.").

*Smith*, 2017 WL 6597933 at *3–4.

Count One of the Winthers' First Amended Complaint is titled a "Common Law Water Claim" and alleges that Defendant "unlawfully interfered with the natural drainage of water from The Preserve onto the Winther Property resulting in damage to the Winthers." (Doc. # 1-1 at ¶ 12). The Winthers' argument that they have presented sufficient evidence of a channelization claim to survive summary judgment (Doc. # 27 at 15) not only misses the point, but also constitutes a tacit admission that their common law water claim, as pleaded in the First Amended Complaint, is precluded by the common enemy doctrine.

The Withers did not plead a channelization claim. (Doc. # 1-1 at 32-37). And, "[u]nder the federal rules, plaintiffs may not plead a new claim in response to the summary judgment motion[]." *Smith*, 2017 WL 6597933 at *4. "[T]he liberal pleading standard of Federal Rule of Civil Procedure 8(a) 'does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage.'" *Id.* (quoting *Gilmour v. Gates, McDonald & Co*., 382 F.3d 1312, 1314–15 (11th Cir. 2004)); *accord Ex parte Burr & Forman, L.L.P*., 5 So. 3d 557, 567 (Ala. 2008) ("The trial court's purported use of the record in this case to determine what claims were

12

being asserted by the plaintiffs was inappropriate; we see no basis for the trial court to have gone outside the complaint to determine what [the plaintiffs] have pleaded.... We are aware of no rule or other authority authorizing a trial court to read into a complaint allegations of unpleaded claims merely because the court sees material in the pretrial record upon which such claims could be based.").

Under the common enemy doctrine, "an upper owner within the city limits has 'an unqualified right to divert the surface waters without incurring legal consequences.'" *Smith*, 2017 WL 6597933 at *4 (quoting *Bailey*, 416 So. 2d at 404). Therefore, Defendant is entitled to summary judgment on the Winthers' common law water claim.

## B.      The Other State Law Claims

The Winthers' other claims of Trespass, Nuisance, Negligence/Wantonness, and for an Injunction are also based on Defendant's alleged diversion of water onto the Winthers' property. (Doc. # 1-1 at 34-37). However, as noted above, subject to one exception that does not apply here, the common enemy doctrine provides "an unqualified right to divert the surface waters *without incurring legal consequences*. . . ." *Purser*, 45 So. 3d at 1252 (quoting *Bailey*, 416 So. 2d at 404). "Because 'legal consequences' certainly includes liability for trespass, nuisance, negligence, and wantonness, these claims are due to be dismissed to the extent they are based on [a faulty diversion of the surface waters]." *Smith*, 2017 WL 6597933 at *4. "Any argument [the Winthers] make[] to the contrary is unfounded." *Purser*, 45 So. 3d at 1252. Because Defendant was entitled to divert surface waters without incurring legal consequences, Defendant is also entitled to summary judgment on the Winthers' Trespass, Nuisance, Negligence/Wantonness, and Injunction claims.

**IV.     Conclusion**

For all the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. # 19) is due to be granted. Because Defendant is entitled to judgment as a matter of law, the remaining pending Motions (Defendant's Motion to Exclude the Testimony of James J Connors (Doc. # 17); Defendant's Motion to Exclude the Testimony of Chris Johnson (Doc. # 18); and Defendant's Motion to Strike the Declaration of Matthew Winter (Doc. # 29)) are moot. An Order consistent with this Memorandum Opinion will be entered.

**DONE** and **ORDERED** this July 13, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE