IIUNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW T. WINTHER, et al.,    } | |
| } | |
| Plaintiffs,    } | |
| } | |
| v.    } | Case No.: 2:18-CV-01693-RDP |
| } | |
| UNITED STATES STEEL    } | |
| CORPORATION,    } | |
| } | |
| Defendant.    } | |

## MEMORANDUM OPINION

This matter is before the court on (1) Plaintiffs' Motion for Partial Summary Judgment on Defendant's Liability for Trespass and Nuisance (Doc. # 94), and (2) Defendant's Motion for Summary Judgment (Doc. # 97). The Motions have been fully briefed (Docs. # 95, 98, 106, 110, 115, 119), and are ripe for decision. For the reasons discussed below, Plaintiff's Motion is due to be denied, and Defendant's Motion is due to be granted in part and denied in part.

I.      **Relevant Undisputed Facts[1]**

The Preserve is a 325-acre mixed use development in Hoover, Alabama, developed by U. S. Steel. (Docs. # 35, 98, 110).[2] Development of The Preserve began in 1998, and physical construction commenced in 2000. (*Id*.). The land's development continues to the present, with Phase 15 ongoing. (*Id*.).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] Plaintiffs have only opposed two of Defendant's proposed undisputed material facts. (Compare Doc. # 98 with Doc. # 110). Where the proposed undisputed facts are not disputed, the court cites to the parties' briefs. The court further notes that the undisputed facts are also set forth in the court's July 13, 2020 Memorandum Opinion. (Doc. # 35).

The City of Hoover (the "City") approved the development as a planned unit development and, as part of the approval process, the City required a presentation of the development's master drainage plan. (*Id*.). Additional drainage reports have been prepared and submitted as needed for approval of the development, but each new phase did not require a separate drainage plan. (*Id*.).

More specific engineering plans are required for each phase of the development, and those plans include detailed analyses and descriptions of any drainage features. (*Id*.). U. S. Steel prepared those plans and received the City's approval, which indicates that the designs complied with the City's regulations. (*Id*.).

U. S. Steel retained Walter Schoel Engineering, Inc. ("Schoel") to develop the master drainage plan (as well as subsequent drainage plans) for The Preserve. (*Id*.). The focus of the plan was Hurricane Branch, flooding of which had impacted existing developments in Hoover long before The Preserve's development. (*Id*.). The entire drainage area for Hurricane Branch is approximately 1.9 square miles (1,200 acres). (*Id*.). At present, the drainage area of The Preserve contributing to Hurricane Branch is approximately 185 acres, or approximately 15% of the overall basin. (*Id*.).

The central component of the master drainage plan was the installation of an undersized culvert at an upstream location, which created significant inline over-detention of stormwater flows. (*Id*.). The City accepted and approved the plan, and the Federal Emergency Management Agency ("FEMA") approved the undersized culvert's installation. (*Id*.). The culvert has been successful in reducing peak flows in Hurricane Branch by 15% to 35%, depending on the particular storm event. (*Id*.).

In 2007, while they were still residents of Arizona, Plaintiffs Tracey and Matthew Winther bought three undeveloped lots adjacent to The Preserve (the "Winther Property") for the total

purchase price of $145,000. (*Id.*). The street addresses are 3412 Flintshire Drive, 3414 Flintshire Drive, and 3418 Flintshire Drive. (*Id.*). Mr. Winther testified that he purchased the Winther Property with the intent to build a home. (Doc. # 96-16 at 21-22).[3] The Winther Property is located in the City and is zoned residential. (Doc. # 92-2 at 94).

Hurricane Branch flows through the Winther Property. (Docs. # 35, 98, 110). The Winther Property is in a ravine, with Hurricane Branch at the ravine's bottom. (*Id.*). The Winther Property slopes steeply upward to Flintshire Drive on its eastern side and slopes steeply upward to The Preserve on its western side. (*Id.*).

The previous owners of the Winther Property were David Rawson and his brother. (*Id.*). Rawson initially purchased and subdivided the property, and intended that he and his brother build homes on Lots 1 and 3, leaving Lot 2 vacant in between them. (*Id.*). In 1991, Rawson obtained a building permit from the City for "Clearing and Grading Only." (Doc. # 92-6 at 6). However, Rawson was a developer and arranged for the construction of driveways crossing Hurricane Branch on Lots 1 and 3 for free or at reduced cost by builders with whom he had a professional relationship. (Docs. # 35, 98, 110). Rawson had building pads "cut in" on Lots 1 and 3 in a similar manner. (*Id.*). In 1999, Rawson also had culverts installed on Lot 3 to cross Hurricane Branch where he had graded a building pad. (Doc. 92-2 at 35, 43, 56). Rawson obtained no permits from the Corps of Engineers or FEMA for the work performed in Hurricane Branch. (Doc. # 35). He sized the culverts "on a scratch pad," and he understood that the stream crossings would flood under certain conditions. (Docs. # 98, 110).

---

[3] The court provides citations to the CM/ECF document and page numbers, except where the citation is to a deposition. In that case, the court cites to the CM/ECF document number and the deposition page number.

Some stormwater runoff flows downhill from The Preserve through a natural drainage way on the Winther Property to Hurricane Branch. (*Id.*). The drainage way is adjacent to the driveway as it makes its way to the building pad on Lot 1, and it empties into Hurricane Branch immediately adjacent to the Lot 1 stream crossing on the downstream side. (*Id.*). This drainage way is referred to as "Tributary 1." (*Id.*). Rawson testified that he added some rocks to the bottom of Tributary 1 right after the building pad was built in 1991. (Doc. # 92-2 at 96-97). The addition of the rocks was the only change Rawson observed regarding Tributary 1 during the period he owned the property. (*Id.* at 97).

Mr. Winther knew the Property was in a floodplain of Hurricane Branch prior to purchase but that knowledge did not affect his decision to buy the Property. (Docs. # 35, 98, 110). The Winthers performed no investigation of the driveways or creek crossings prior to purchase and do not know if an emergency vehicle such as a fire truck could navigate the driveway or cross Hurricane Branch during a rainstorm. (*Id.*).

Years later, in late 2010, the Winthers relocated to Hoover. (*Id.*). They rented a house, anticipating that they would build a home in short order. (*Id.*). However, due to their financial condition, they initially were not successful in securing financing from a lender to build a house. (*Id.*). The Winthers continued to rent different properties until they purchased a house in mid-2018. (*Id.*).

Other than a few preliminary inquiries, the Winthers have never taken any concrete steps toward building a home on the Property, such as seeking a building permit. (*Id.*). Although the Winthers contend increased flows from The Preserve are precluding them from developing Lot 1, the Winthers agree that none of those concerns have prevented them from building on Lot 3. (*Id.*).

Matthew Winther first became aware of water runoff from The Preserve in 2014 because of a "pretty substantial rain event . . . ." (Doc. 92-3 at 59-61). Mr. Winther associated the increased water flows during rain events with an increased rate of erosion of Tributary 1. (*Id*.). Mr. Winther testified that sometime in 2014, there was a "first flood event" where water "went over the creek crossing" on Lot 3. (Doc. # 92-3 at 60, 62). He also testified that he thought there was more debris (trees, branches, and construction materials like buckets) coming down the creek. (*Id*. at 62-63).

Mr. Winther complained to U. S. Steel, the City, the Alabama Department of Environmental Management, and the Corps of Engineers. (Docs. # 35, 98, 110). He asserted that Tributary 1 was experiencing increased stormwater flows and erosion. (*Id*.). A meeting was held on March 17, 2015 at the City's offices to discuss Mr. Winther's concerns. (*Id*.). The City Engineer, Rod Long, Mr. Winther, representatives from U. S. Steel, and representatives from Schoel attended the meeting. (*Id*.).

During the March 17 meeting, Schoel explained its view that increased flows from The Preserve were not causing increased erosion to Tributary 1. (*Id*.). Rather, in Schoel's professional opinion, the construction of the driveway and building pad on Lot 1 had impinged on and narrowed the natural drainage way, which channelized and increased the velocity of stormwater flows. (*Id*.). Long agreed with Schoel's assessment. (*Id*.). As a solution, U. S. Steel offered to armor Tributary 1 by the driveway and stream crossing where the increased erosion was observed. (*Id*.). Mr. Winther did not believe the proposed armoring "was an acceptable resolution to the problem." (*Id*.).

While Schoel did not believe the erosion in Tributary 1 was attributable to increased stormwater flows from The Preserve, it nevertheless began researching other possibilities for reducing flows down Tributary 1. (*Id*.). Schoel ultimately suggested collecting a significant portion

5

of flows that had gone to Tributary 1 and re-routing them to another drainage feature that was entirely on U. S. Steel's property and emptied into Hurricane Branch at another location, upstream of the Winther Property. (*Id*.). This alternative drainage way is referred to as "Tributary 2" or the "Preserve Brook." (*Id*.). The City approved the plans to re-route the stormwater flows as suggested by Schoel in October 2015 as part of its approval of the Phase XIV preliminary plat package. (*Id*.).

Phillips, an engineer hired by U.S. Steel, testified that U.S. Steel was aware of erosion on the Winther Property in 2015 when plans were devised to re-route stormwater away from the Winther Property and into Preserve Brook/Tributary 2, a stream on The Preserve's property. (Doc. # 92-13 at 43-45). Since 2015, when flows that had gone to Tributary 1 were re-routed to Tributary 2, the volume of the water flowing in Tributary 2 has increased. (Doc. # 92-11 at 54-56).

Mr. Winther testified that, since September 2019, he has observed the creek crossing on Lot 3 of the Property being topped with more water with greater frequency than before September 2019. (Doc. # 92-8, ¶ 7). And, he testified that, since 2019, this happens with any substantial rain event. (*Id*.).

On October 6, 2021, there was a rain event in Hoover, Alabama that "exceeded [a] 100-year event and whose magnitude approached [a] 500-year event." (Doc. # 96-1 at 7). During this rain event, box culverts that Defendant had installed as part of a road crossing over Preserve Brook at a higher elevation than the confluence of Preserve Brook and Hurricane Branch failed while under construction. (*Id*. at 16). As a result of the culvert failure on October 6, 2021, some construction fill -- including soil, gravel, and riprap materials -- could have been carried offsite through Preserve Brook. (*Id*.).

Stephen Castleman has been retained as an expert by U.S. Steel's attorneys in this case. (Doc. # 92-11 at 14). During his inspection of the Winther Property, Castleman observed limestone

riprap, which is not native to Hurricane Branch, but he cannot say where it came from. (*Id*. at 56). Castleman opined that the riprap is "carried by stream flow from some location other than here. Whether that's in the tributary or whether that's in Hurricane Branch I can't tell you." (*Id*. at 57). Castleman also testified that off-site impacts from the development of The Preserve are unavoidable. (Doc. # 92-11 at 107-108).

Mr. Winther testified that he has two concerns in this case. First, he points to the erosion of Tributary 1 next to the driveway on Lot 1. (Docs. # 35, 98, 110). Mr. Winther further believes that increased flow rates in Hurricane Branch related to The Preserve have damaged the driveways and prevent home construction because of potential future access issues. (*Id*.).

**II.     Legal Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

*Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

8

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Ctv., Md.*, 2006 WL 2632298, at *5 (D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**III.    Analysis**

The Winther's First Amended Complaint contains five claims: (1) "Count One – Common Law Water Claim"; (2) "Count Two – Trespass"; (3) "Count Three – Nuisance"; (4) "Count Four – Negligence/Wantonness"; and (5) "Count Five – Injunction." (Doc. # 1-1 at 34- 36).

Plaintiffs have moved for partial summary judgment on liability on their Trespass and Nuisance claims. (Doc. # 95). They argue that (1) the undisputed evidence shows that sediment

and rock from The Preserve have been deposited on the Winther Property which affected their interest in the exclusive possession of their Property, (2) continued development of The Preserve was done intentionally and with reasonable foreseeability that it could result in an invasion of the Winther Property, (3) they have presented evidence of substantial damage to the Property, and (4) the undisputed evidence establishes the elements of nuisance. (Doc. # 95 at 2).

Defendant has moved for summary judgment on all claims. (Doc. # 98). Defendant argues that (1) there is no evidence to support Plaintiffs' nuisance claim, (2) Plaintiffs' claims lack evidentiary support without expert testimony, (3) Plaintiffs have no damages, (4) Plaintiffs cannot recover punitive damages because there is no evidence that Defendant acted with ill will, and (5) alternatively, Plaintiffs' injunctive relief claim should be dismissed because recovery of monetary damages would be sufficient. (Doc. # 98 at 2).

### A.     **Common Law Water Claim**

The Eleventh Circuit held that Count One of Plaintiffs' First Amended Complaint "clearly, if not expressly, raised a common-law water claim based on the channelization theory, which is not barred by the common enemy doctrine." (Doc. # 48-1 at 7-8). Under this theory, "an upper proprietor who collects surface water onto a channel and casts it upon the property of the lower proprietor is liable for damages even though the property is in an incorporated city or town." *Smith v. Fam. Dollar Stores, Inc.*, 2017 WL 6597933, at *3 (N.D. Ala. June 1, 2017) (quoting *Mitchell v. Mackin*, 376 So. 2d 684, 686 (Ala. 1976)).

To raise a genuine issue of fact for a jury to resolve, Plaintiffs must present evidence "that (i) [a] diversion or channelization actually occurred, and altered the status quo of the flow of water, and (ii) Plaintiff's property was substantially damaged as a result. *Schambeau Properties, LP v. Waffle House, Inc.*, 2012 WL 253441, at *2 (S.D. Ala. Jan. 26, 2012); *see also Sargent v. Lambert*

*Const. Co.*, 378 So. 2d 1153, 1155 (Ala. Civ. App. 1979) ("The proper test is whether or not by reason of that construction the surface water was changed from its natural flow and caused to be deposited on the complainant's property to his damage.").

The undisputed evidence shows that, as part of the master drainage plan for The Preserve, an undersized culvert was installed. It also shows that the culvert was successful in reducing peak flows in Hurricane Branch. Despite the undersized culvert, some stormwater runoff flows downhill from The Preserve through a *natural* drainage way (Tributary 1) on the Winther Property to Hurricane Branch. After Mr. Winther complained that there was erosion occurring on his Property, Defendant researched possibilities for reducing flows down Tributary 1. (*Id.*). Plans were devised to re-route stormwater flows that had gone to Tributary 1 away from the Winther Property and into Preserve Brook/Tributary 2, a stream on The Preserve's property.

Thus, there is evidence in the record to support a diversion of water at The Preserve. However, whether Plaintiffs' property was substantially damaged by any diversion by Defendant is a hotly contested question. Plaintiffs assert that the stormwater flows increased because of the development of The Preserve and caused erosion on their property. They have presented pictures allegedly showing changes on their Property. However, Defendant's engineer, Schoel, explained that increased flows from The Preserve were not causing increased erosion to Tributary 1.

Thus, there are material questions of fact for a jury to resolve as to Plaintiffs' common-law water claim based on the channelization theory. Therefore, Defendant's Motion for Summary Judgment on this claim is due to be denied.

### B. Trespass

Plaintiffs do not allege a direct trespass here – *i.e.*, that Defendant itself entered their property. Rather, they allege an indirect trespass. "[T]he Alabama Supreme Court has held that the

11

channeling of surface water onto a lower proprietor's land will support an indirect trespass cause of action against the party responsible for the channeling." *Easterling v. Awtrey Bldg. Corp.*, 770 So. 2d 606, 609 (Ala. Civ. App. 1999). To prove an indirect trespass claim, Plaintiffs must establish four elements: "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the *res*." *Easterling*, 770 So. 2d at 609 (quoting *W.T. Ratliff Co. v. Henley*, 405 So. 2d 141, 145-46 (Ala. 1981)).

Defendant's expert, Castleman, testified that off-site impacts from the development of The Preserve are unavoidable. (Doc. # 92-11 at 107-108). Nevertheless, development of The Preserve is ongoing. Plaintiffs have presented their own testimony regarding erosion on their property and, as discussed above, there is undisputed evidence that limestone riprap, which is not native to Hurricane Branch, was noted on Plaintiffs' property. But, whether The Preserve is the source and cause of these issues, and whether they caused any "substantial damage," is disputed. Therefore, there is a genuine issue of fact for a jury to resolve and both parties' Motions for Summary Judgment are due to be denied as to Plaintiffs' Trespass claim.

### C. Nuisance

"A nuisance is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of fastidious taste, but it should be such as would affect an ordinary reasonable man." *Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001) (quoting Ala. Code 1975, § 6-5-120 (internal quotations omitted)). "'The essence of private nuisance is an interference with the use and enjoyment of land. [] So long as the

interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance to the enjoyment of property may amount to a nuisance.'" *Morgan Cnty. Concrete Co. v. Tanner*, 374 So. 2d 1344, 1346 (Ala. 1979) (quoting W. Prosser, *Handbook of the Law of Torts* § 89, at 591-93 (4th ed. 1971)).

Plaintiffs have presented evidence of turbid water flowing into Hurricane Branch bringing silt, rock, and debris that was deposited on their Property. Whether this matter (1) originated at The Preserve, (2) caused a substantial and unreasonable interference with the use of their property, and (3) that interference would be offensive or inconvenient to the normal person are not issues that the court can resolve as a matter of law. These questions present disputed issues of material fact that require resolution by a jury. Therefore, Defendant's Motion for Summary Judgment on Plaintiffs' nuisance claim is due to be denied.

### D. Negligence/Wantonness

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the plaintiff suffered a loss or injury, that the defendant's breach was an actual cause of the injury, and that the defendant's breach was a proximate cause of the injury." *Haddan v. Norfolk S. Ry. Co.*, 367 So. 3d 1067, 1072 (Ala. 2022) (citing *QORE, Inc. v. Bradford Bldg. Co.*, 25 So. 3d 1116, 1124 (Ala. 2009)). Wantonness is "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citing *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994)). Alabama courts have repeatedly recognized that wantonness and negligence are "qualitatively differently tort concepts" and "wantonness is not merely a higher degree of culpability than negligence." *Essary*, 992 So. 2d at 9 (quoting *Tolbert v.*

*Tolbert*, 903 So. 2d 103, 114-15 (Ala. 2004)); *see also Mandella v. Pennington*, 73 So. 3d 1257, 1264 (Ala. Civ. App. 2011) (citations omitted).

Plaintiffs have not moved for summary judgment on this claim. Defendant has not specifically moved for summary judgment on this claim. Rather, Defendant moved for summary judgment on all claims because, it argues, Plaintiffs cannot establish their claims without expert testimony and they have no damages.

The common law establishes a duty on Defendant not to channelize water onto a lower landholder's land. There are questions of fact regarding whether Defendant breached that duty and whether Plaintiffs suffered any damages as a result of that breach. Thus, there is sufficient evidence in the Rule 56 record to support Plaintiffs' negligence claim.

There is also evidence in the record that, despite being made aware of issues on the Winther Property, Defendant continued to develop additional phases of The Preserve and that off-site impacts from the development of The Preserve are unavoidable. There is also evidence in the summary judgment record that, while disputing that The Preserve was the cause of any alleged problems, Defendant undertook certain mitigation efforts designed to alter stormwater flows away from Plaintiffs' property. But, whether those efforts were sufficient to negate any alleged ill intent on Defendant's part is a matter the parties contest and it is for a jury to decide. *See*, *e.g.*, *Craig v. Forest Inst. of Pro. Psychology*, 713 So. 2d 967, 975 (Ala. Civ. App. 1997) ("Ordinarily, the question of [] intent is a matter peculiarly within the province of the finder of fact[]."). Therefore, Defendant is not entitled to summary judgment on Plaintiffs' negligence and wantonness claim.

### E. Plaintiffs' Damage Claims Present a Question of Fact for the Jury

Defendant argues that Plaintiffs' claims all fail because they cannot present evidence of damages. It argues that, without a valuation expert's opinion as to the before and after value of the

Winther Property, Plaintiffs have no substantial evidence of how much their Property has diminished in value or even that it has diminished in value. However, this argument misses the mark. "'It is the rule in Alabama that any person, including a layman, is competent to testify as to his opinion concerning the value of land if he has had an opportunity for forming a correct opinion and testifies in substance that he has done so.'" *Mississippi Valley Title Insurance Co. v. Malkove*, 540 So. 2d 674, 679 (Ala. 1988) (quoting *Calvin Reid Constr. Co. v. Coleman*, 397 So. 2d 145 (Ala. Civ. App. 1981)). And, as to Plaintiffs' nuisance claim, Plaintiffs need only establish that they suffered an inconvenience. *Russell Corp.*, 790 So. 2d at 951. Their own testimony is sufficient for these purposes. *See State Farm Fire & Cas. Co. v. Williams*, 926 So. 2d 1008, 1017 (Ala. 2005).

Defendant can present whatever evidence it may have that Plaintiffs did not suffer any damage or inconvenience. But, the issue of whether Plaintiffs suffered damage or inconvenience is a question of fact that will require resolution by the trier of fact.

### F. Injunction

Injunctive relief is available on the type of claim asserted by Plaintiffs:

> "The remedy of an injunction is available for trespasses of this nature. *See, e.g., Poffenbarger v. Merit Energy Co.*, 972 So. 2d 792, 802 n. 11 (Ala. 2007) (noting that "[i]n an appropriate case, the equitable remedy of an injunction can be an appropriate form of relief by which a thing or a substance tortiously placed on another's land can be removed or by which an injury to property otherwise is corrected and the property restored to its pre-trespass condition"); *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 530 (Ala. 1979) (explaining the difference between a nuisance and an "actionable trespass" for an "indirect invasion" of property in which "some substance has entered upon the land itself")."

*Water Works & Sewer Bd. of the City of Birmingham v. Inland Lake Invs., LLC*, 31 So. 3d 686, 691-92 (Ala. 2009)

However, "[a]n injunction is a remedy, not a separate claim or cause of action." *Byrd v. Buckner*, 2020 WL 2046375, at *10 (M.D. Ala. Apr. 28, 2020) (citing *Martin v. Patterson*, 975

So. 2d 984, 990 (Ala. Civ. App. 2007) (noting that to obtain a permanent injunction, the movant must first prevail on the merits of the underlying claim)); *see also Collier v. Buckner*, 303 F. Supp. 3d 1232, 1280 (M.D. Ala. 2018) (same). While Plaintiffs may seek injunctive relief on certain of their underlying claims, Count Five of their First Amended Complaint stating a separate claim for an injunction is due to be dismissed.

## IV.   CONCLUSION

For all of the reasons set forth above, the court concludes that:

1. Plaintiffs' Motion for Partial Summary Judgment on Defendant's Liability for Trespass and Nuisance (Doc. # 94) is due to be denied;

2. Defendant's Motion for Summary Judgment (Doc. # 97) is due to be granted in part and denied in part.

   a. The Motion is due to be granted to the extent that Count Five of Plaintiff's First Amended Complaint purporting to state a separate Injunction claim is due to be dismissed.

   b. In all other respects, the Motion is due to be denied.

A separate order in accordance with this Memorandum Opinion will be entered

**DONE** and **ORDERED** this November 3, 2023.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE