FILED

2025 Feb-25  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| MATTHEW T. WINTHER, et al., | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | Case No.:  **2:18-cv-01693-RDP** |
| | } | |
| UNITED STATES STEEL | } | |
| CORPORATION, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This matter is before the court on United States Steel Corporation's ("U.S. Steel") Renewed Motion for Judgment as a Matter of Law (Doc. # 177), Plaintiffs' Motion for New Trial (Doc. # 178), and Plaintiffs' Motion to Award Injunctive Relief. (Doc. # 179). The Motions have been fully briefed (Docs. # 177, 183, 186; 178, 181, 185; 179, 182, 184) and are ripe for a decision. For the reasons stated below, U.S. Steel's Renewed Motion for Judgment as a Matter of Law (Doc. # 177) is due to be denied, and Plaintiffs' Motion for New Trial (Doc. # 178) and Motion to Award Injunctive Relief (Doc. # 179) are due to be denied.

## I.    Background

Matthew and Tracey Winther ("Plaintiffs") own three undeveloped lots (the "Winther Property"), totaling approximately six acres. (Doc. # 125 at 2). These lots are situated adjacent to U.S. Steel's 325-acre mixed use development known as The Preserve in Hoover, Alabama. (*Id.*). Plaintiffs allege that U.S. Steel interfered with the natural drainage of water, resulting in damage to the Winther Property. (*Id.*). U.S. Steel has denied Plaintiffs' claims. (*Id.*).

U.S. Steel began developing The Preserve in 1998 and physical construction commenced in 2000. (*Id.*). The land is still being developed today, and is now in Phase 15. (*Id.*). The City of

Hoover (the "City") approved the development as a planned unit development and, as part of the approval process, required a presentation of the development's master drainage plan. (*Id.* at 3). Additional drainage reports have been prepared and submitted as needed for approval of the development, but each new phase did not require a separate drainage plan. (*Id.*). Engineering plans are required for each phase of the development, and those plans include detailed analyses and descriptions of any drainage features. (*Id.*). U.S. Steel prepared those plans and received the City's approval, which indicates that the designs complied with the City's regulations. (*Id.*).

U.S. Steel retained Walter Schoel Engineering, Inc. ("Schoel") to develop the master drainage plan (as well as subsequent drainage plans) for The Preserve. (*Id.*). The focus of the plan was Hurricane Branch, which is a waterway that had previously experienced flooding and had impacted existing developments in Hoover long before The Preserve's development. (*Id.*). The entire drainage area for Hurricane Branch is approximately 1.9 square miles (1,200 acres). (*Id.*). At present, the drainage area of The Preserve contributing to Hurricane Branch is approximately 185 acres, or approximately 15% of the overall basin. (*Id.*).

The central component of the master drainage plan was the installation of an undersized culvert at an upstream location. (*Id.*). This created significant inline over-detention of stormwater flows. (*Id.*). The City accepted and approved the plan, and the Federal Emergency Management Agency ("FEMA") approved the undersized culvert's installation. (*Id.*). The culvert has been successful in reducing peak flows in Hurricane Branch by 15 to 35%, depending on the particular storm event. (*Id.*).

In 2007, while they were still residents of Arizona, Plaintiffs bought the Winther Property for the total purchase price of $145,000. (*Id.*). Mr. Winther testified that he purchased the Winther Property with the intent to build a home. (*Id.*). The Winther Property is located in the City and is

zoned residential. (*Id.*). Hurricane Branch flows directly through the Winther Property. (*Id.*). The Winther Property is situated in a ravine, with Hurricane Branch located at the ravine's bottom. (*Id.*).

The previous owners of the Winther Property were David Rawson ("Rawson") and his brother. (*Id.*). Rawson initially purchased and subdivided the property and the intent was that he and his brother would build homes on what would become Lots 1 and 3, leaving Lot 2, which was in between them, vacant. (*Id.*). In 1991, Rawson, who is a developer, arranged for the construction of driveways crossing Hurricane Branch on Lots 1 and 3. (*Id.* at 4). The work was done for free or at reduced cost by builders with whom he had a professional relationship. (*Id.*). Rawson had building pads "cut in" on Lots 1 and 3 in a similar manner. (*Id.*). In 1992, after he constructed a building pad and the driveway on Lot 1, which included the installation of the culverts to cross Hurricane Branch, the City approved a subdivision of the Property into three lots. (*Id.*). In 1999, Rawson also had culverts installed on Lot 3 to cross Hurricane Branch. (*Id.*). He sized the culverts "on a scratch pad," and he understood that the stream crossings would flood under certain conditions. (*Id.*).

Some stormwater runoff flows downhill from The Preserve through a natural drainage way on the Winther Property to Hurricane Branch. (*Id.*). The drainage way runs adjacent to the driveway as it makes its way to the building pad on Lot 1 and empties into Hurricane Branch immediately adjacent to the Lot 1 stream crossing on the downstream side. (*Id.*). This drainage way is referred to as "Tributary 1." (*Id.*).

After purchasing the property in 2007, the Winthers relocated to Hoover in 2010. (*Id.*). They rented a house, anticipating that they would build a home in short order. (*Id.*). However, due to their financial condition, they initially were unsuccessful in securing financing from a lender to

build a house. (*Id.*). The Winthers continued to rent different properties until they purchased a house in mid-2018. (*Id.*). Other than a few preliminary inquiries, the Winthers have never taken any concrete steps toward building a home on the property, such as seeking a building permit. (*Id.*).

Mr. Winther first became aware of water runoff from The Preserve in 2014 because of a rain event. (*Id.*). Mr. Winther associated the increased water flows during rain events with an increased rate of erosion of Tributary 1. (*Id.*). Mr. Winther testified that sometime in 2014, there was a "first flood event" where water "went over the creek crossing" on Lot. 3. (*Id.*). He also testified that he thought there was more debris (trees, branches, and construction materials like buckets) coming down the creek. (*Id.*)

Mr. Winther complained to U.S. Steel, the City, the Alabama Department of Environmental Management ("ADEM"), and the Corps of Engineers. (*Id.* at 5). He asserted that Tributary 1 was experiencing increased stormwater flows and erosion. (*Id.*). A meeting was held on March 17, 2015 at the City's offices to discuss Mr. Winther's concerns. (*Id.*). Rod Long (the City Engineer), Mr. Winther, representatives from U.S. Steel, and representatives from Schoel attended the meeting. (*Id.*).

During the March 17 meeting, Schoel explained its view that increased flows from The Preserve were not causing increased erosion in Tributary 1. (*Id.*). Rather, in Schoel's professional opinion, the construction of the driveway and building pad on Lot 1 had impinged on and narrowed the natural drainage way, which channelized and increased the velocity of stormwater flows. (*Id.*). Long agreed with Schoel's assessment. (*Id.*). As a solution, U.S. Steel offered to armor Tributary 1 by the driveway and stream crossing where the increased erosion was observed. (*Id.*). Mr.

Winther did not believe the proposed armoring "was an acceptable resolution to the problem." (*Id.*).

Andrew Phillips ("Phillips"), an engineer hired by U.S. Steel, testified that U.S. Steel was aware of erosion on the Winther Property in 2015 when plans were devised to re-route stormwater away from the Winther Property and into The Preserve Brook/Tributary 2, a stream on The Preserve's property. (*Id.*). He testified that since 2015, when flows that had gone to Tributary 1 were re-routed to Tributary 2, the volume of the water flowing in Tributary 2 has increased. (*Id.*).

Mr. Winther testified that, since September 2019, he has observed the creek crossing on Lot 3 of the property being topped with more water with greater frequency than before September 2019. (*Id.*). And, he testified that since 2019 this would happen whenever there was a substantial rain event. (*Id.*).

On October 6, 2021, there was a rain event in Hoover, Alabama that "exceeded [a] 100-year event and whose magnitude approached [a] 500-year event." (*Id.*). During this rain event, box culverts that were under construction and that U.S. Steel had installed as part of a road crossing over Preserve Brook at a higher elevation than the confluence of Preserve Brook and Hurricane Branch failed. (*Id.*). As a result of the culvert failure, some construction fill – including soil, gravel, and riprap materials – could have been carried offsite through Preserve Brook. (*Id.*)

Stephen Castleman, an expert retained by U.S. Steel's attorneys in this case inspected the property. (*Id.*). During his inspection, Castleman observed limestone riprap, which is not native to Hurricane Branch; however, he could not say where it came from. (*Id.*) Castleman opined that the riprap is "carried by stream flow from some location other than here. Whether that's in the tributary or whether that's in Hurricane Branch I can't tell you." (*Id.* at 5-6). Castleman also testified that off-site impacts from the development of any construction site, including The Preserve, are

unavoidable. (*Id.* at 6). Castleman testified that the development of The Preserve has increased the volume of the water flowing in Tributary 2 which discharges into Hurricane Branch. (*Id.*). It is Castleman's opinion that sediment from The Preserve has been deposited onto the Winther Property. (*Id.*).

Plaintiffs filed this case in the Circuit Court of Jefferson County, Alabama in October 2017 (Doc. # 1-1). The case was removed to this court in October 2018. (Doc. # 1). In September 2024, the case was tried to a jury. At trial, Plaintiffs presented four claims to the jury: (1) a common law water claim, (2) a trespass claim, (3) a nuisance claim, and (4) a negligence claim. Although Plaintiffs' Complaint contained a claim for negligence/wantonness (*see* Doc. # 1-1 at 34), at the close of all the evidence, the court granted U.S. Steel's motion for judgment as a matter of law on the wantonness claim, concluding that there was not sufficient evidence presented to the jury as to wantonness. (Unofficial Transcript from Sept. 19, 2024 at 91).

At trial, the jury heard from various lay witnesses and three expert witnesses: Dennis Key, Scott Allen, and Dr. Walter Schoel. The jury also viewed several photographs of the Winther Property taken at different points in time, as well as two montage videos that Mr. Winther composed, which depict the Winther Property as it has evolved over time.

First, the jury heard from David Rawson, who testified that from 1991 until 2007, when Plaintiffs bought the property, there were no significant changes to the property (Unofficial Transcript from Sept. 16, 2024 at 62),[1] nor was there any riprap. (*Id.* at 86). Rawson also testified that during that time, he did not have any problems with water flowing through Hurricane Branch onto the property. (*Id.* at 62-63). At trial, Rawson was asked about his recent visit to the Winther

---

[1] Because the parties did not request the full transcript from the trial proceedings, the full transcript is not on the court's public docket. For this reason, the court refers to any testimony or evidence submitted at trial that is not on the public docket as the "Unofficial Transcript" and denotes the date (and, if applicable, the time) in which the testimony or evidence was heard at trial.

Property, which was two days before the trial. When asked whether the property had changed since he sold it to Plaintiffs, Rawson replied that it had changed: "It's been washed away. . . . There's no cover on the culverts. There's boulders all over the place, piles of silt . . . ." (*Id.* at 63). And, when asked specifically about what the creek bed on the property looked like, Rawson said, "Well, it was very irregular. You could just see where all the sediment had just come in and settled out." (*Id.*).

Next, the jury heard testimony from Dr. James Connors, who is a hydrologist. (Unofficial Transcript from the morning of Sept. 17, 2024 at 2). Dr. Connors testified that he visited the Winther Property on four separate occasions: in May and August 2019, August 2022, and on September 16, 2024 (the day before he testified at trial). (*Id.* at 9). Dr. Connors testified that when he visited the Winther Property in 2019, he did not see any riprap, but when he visited the property in 2022, he saw riprap on top of the exposed culverts by the bridge. (*Id.* at 17). He also testified that compared to what he observed in 2019, there was more sediment piled up on the streambed. (*Id.* at 19). Dr. Connors also testified about his visit to the Winther Property the day before his appearance at trial. He testified that "[Tributary 1 is] really experiencing a lot of what we call head water erosion, so it's – it's eroding back toward the source" (*id.* at 30), and he testified that he saw "significantly more" rocks on the property than he did in 2022." (*Id.* at 33). At trial Dr. Connors was also presented with one of Plaintiffs' photographs depicting the Winther Property. (*Id.* at 28-29). Dr. Connors testified as to what he saw in the photograph: "You can see an awful lot of these light angular stones. That is the riprap that is in Tributary 2 . . . . You can look at the trees all along the bank . . . their root balls are pretty extensively eroded." (*Id.* at 29). Dr. Connors also testified that the riprap depicted in the photograph is not native to the Winther Property. (*Id.* at 33). He

further testified as to how development (like The Preserve) and deforestation can cause stormwater runoff, erosion, and the movement of sediment. (*Id.* at 8).

The jury also heard testimony from Erin Sapp, who works for U.S. Steel and has been the project manager at The Preserve since 2013. (Doc. # 187 at 4). Sapp testified that as part of the development of The Preserve, many trees in its largely wooded areas were cut down. (*Id.* at 6-7). Sapp also testified that when he became aware of Mr. Winther's concerns involving the stormwater runoff on his property (*id.* at 14), the City requested that U.S. Steel try to resolve the problem. (*Id.*). U.S. Steel asked Schoel to come up with various proposals to resolve the issue. (*Id.*). One of Schoel's ideas was a detention pond, which would catch water that was being discharged onto the Winther Property. (*Id.* at 15-17). However, Sapp testified that U.S. Steel ultimately decided not to implement the detention pond because of costs (*id.* at 34) and because "experts told [U.S. Steel] that it wasn't an accurate – it wasn't a solution that – for the issue." (*Id.* at 40). In addition to money, Sapp testified that to implement the detention pond, U.S. Steel would also have required a Corps of Engineer permit. (*Id.*).

Sapp testified that instead of the detention pond, U.S. Steel offered to put stream armoring in the Plaintiffs' ditch to prevent further erosion. (*Id.* at 20-21). Sapp testified that Mr. Winther rejected the idea of the armoring (*id.* at 30-31), so the solution U.S. Steel ultimately decided on was to reroute the water from Tributary 1 into Tributary 2. (*Id.* at 84-85). At trial, Sapp was presented with a picture of the streambed and was asked if that area had been eroded, to which he replied, "it has eroded some." (*Id.* at 59). When asked whether the erosion is from stormwater, he replied, "I would assume so, yes." (*Id.*). Sapp also testified there was riprap in the streambed, but indicated that he did not know how the riprap got there. (*Id.* at 60).

Andrew Phillips also testified at trial. Phillips is an engineer and has worked for Schoel since 2006. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 45). Phillips testified that Schoel visited the Winther Property when Mr. Winther complained about stormwater runoff, and at the time of his visit, he saw there was an issue with erosion on the property. (*Id.* at 51). When asked if he thought the cause of that erosion was discharge from The Preserve, Phillips replied, "I believe that could have been a factor in it, yes." (*Id.*). Later, on cross-examination, Phillips testified that there could have been other factors that contributed to the erosion, such as the fill that was placed in the drainage way. (*Id.* at 70). Phillips was also asked, "In the development of The Preserve, it increased the amount of water that was being discharged onto the Winther property, correct?" to which Phillips responded, "Correct." (*Id.* at 53). Phillips also specifically testified that the development of The Preserve caused the amount of water discharged into Tributary 1 to increase. (*Id.*).

Phillips further testified that once Schoel realized "there was a problem on the Winther property that had been caused by the additional discharge of stormwater from The Preserve," Schoel worked quickly to find a way to fix the issue. (*Id.*). Similar to Sapp's testimony, Phillips testified that one of the ideas Schoel came up with was a detention pond. (*Id.*) Phillips testified that the detention pond would cost close to an estimated $100,000 (*id.* at 57) and would require a permit from the Corps of Engineers. (*Id.* at 55). Phillips further testified that the detention pond was not implemented, and instead, a reroute of water from Tributary 1 to Tributary 2 was implemented. (*Id.* at 58). Phillips testified that the rerouting increased stormwater discharge into Tributary 2 and Hurricane Branch. (*Id.* at 63). Phillips also testified that while Schoel designed riprap to go into the walls of Tributary 2, Schoel did not intend for riprap to go into the streambed. (*Id.* at 68).

The jury also heard testimony from Brett Macek, who works for the ADEM. (*Id.* at 84). Macek testified that when he visited The Preserve, he saw sediment leaving The Preserve and being deposited in Hurricane Branch and onto adjacent property. (*Id.* at 84-85).

Mr. Winther also testified at trial. He described the changes he has seen on his property, and that he first noticed these changes in early April 2014. (*Id.* at 104). Mr. Winther testified that the flow of water coming down Hurricane Branch steadily increased from 2014 forward. (*Id.* at 127). He also testified that he noticed a change in the types of things coming downstream at Hurricane Branch, explaining that "sticks and branches" became "trees, big things." (*Id.* at 128). Mr. Winther also explained that he started to notice debris coming downstream, which he labeled as "odd construction debris" and that he saw buckets, nets, and silt fences. (*Id.*). Mr. Winther also testified that when he met with the City, U.S. Steel, ADEM, and Schoel, the only solution that was offered to him to solve the stormwater runoff problems on his property was the stream armoring (*id.* at 116), but he rejected that idea. (*Id.* at 117).

Mr. Winther also testified that he saw a change in the water coming into Tributary 1, explaining that he used to see clear water flowing into Tributary 1, but then it became turbid and dark. (*Id.* at 120). Mr. Winther testified that he saw riprap on his property in 2021, and that it was large, describing it "as big as your head." (*Id.* at 21). He testified that he had not seen riprap on his property as large as that before 2021. (*Id.* at 22). Mr. Winther also testified as to how Hurricane Branch has changed since 2014: "[i]t has in some places gotten deeper and a lot places it's gotten wider. And in some places it's gotten much shallower due to being filled with you know, all sorts of – all manner of rocks, with riprap . . . ." (*Id.* at 39). Mr. Winther also testified that upon realizing the problem in 2014 he asked U.S. Steel to take steps to cause water discharged from The Preserve to return to its original condition, but that the problem has not gotten better over the last ten years.

10

(*Id.* at 49). Mr. Winther was shown various photographs depicting his property. He testified about what he saw in the photographs: turbulent flow, material being carried downstream, and sediment. (*Id.* at 119, 126). Mr. Winther also described a change in water flow, describing how the water used to trickle down, but now rushes more strongly. (*Id.* at 122).

The jury also heard from an appraiser, Dennis Key, who was called by Plaintiffs and testified that he conducted a before and after appraisal on the Winther Property. (*Id.* at 93). Key submitted a report on his appraisal, which was admitted as Plaintiffs' Exhibit 98. (*Id.*). Key's before appraisal was what he understood the Winther Property to be worth before 2014 and his after appraisal was what the Winther Property was worth in its current condition. (*Id.* at 94). Key found a decrease in the property's value in the amount of $253,006 during that time. (*Id.* at 105).

The jury also heard testimony from Rodney Long, who served as the City's Engineer from 1999 to 2020. (Doc. # 190 at 5). Long testified about when he became aware of Mr. Winther's complaints about the stormwater runoff, and detailed how after being made aware of the complaints, he went to the Winther Property, "walked around and looked at everything there, and [] observed what was going on down there at that time." (*Id.* at 11). Long also testified that when the City, U.S. Steel, and Schoel met with Mr. Winther to address his concerns, one of the potential solutions raised was stream armoring. (*Id.* at 17). Long also testified that another solution that was considered was implementing a detention pond, but that solution was not adopted. (*Id.*). Long further testified that he witnessed the negative impact the development was having on the Winther Property. (*Id.* at 27). When he was presented with a photograph at trial, he acknowledged "erosion coming down this ditch in the photograph, and so there was erosive actions taking place." (*Id.* at 87).

Finally, the jury heard testimony from Dr. Walter Schoel, who works at Schoel and was the author of the master drainage plan at The Preserve. (Doc. # 189 at 60). At trial, he was designated as an expert in applied hydraulics and hydrology, and land development. (*Id.* at 6-7). Dr. Schoel testified that when he became aware of Mr. Winther's concerns with the stormwater discharge on the Winther Property (*id.* at 17), he went to visit the property, and after visiting the property, he thought the erosion on the property was being caused by the friable material in the channel. (*Id.* at 22). He testified as follows: (1) "So it was my opinion that it was eroding because it was unusually friable and erodible, and any reasonable amount of stormwater on it was going to cause it to erode." (*Id.* at 23); and (2) "But the fact that there was erosion was because the channel was unusually friable. There was not erosion immediately upstream. It's the same water. So I put the blame on the channel and the construction work." (*Id.* at 25).

Dr. Schoel also testified about the meeting with Mr. Winther, Schoel, the City, ADEM, and U.S. Steel. (*Id.* at 24). His proposed solution to Mr. Winther's concerns was to armor the channel. (*Id.* at 24). He testified, "If Mr. Winther would have wanted – or would have allowed that as a solution, we would have gone back to the drawing board and tried to find something that was acceptable to him and would have worked good in a residential setting." (*Id.* at 26). But, according to Dr. Schoel, "Mr. Winther said that he was not going to entertain that option, so we didn't go any further. And frankly, the result of the meeting was he wanted us to look at other things." (*Id.*).

Dr. Schoel testified that after the meeting with Mr. Winther, the City suggested they look into detention ponds. (*Id.* at 27). But, Dr. Schoel "never felt the detention pond was going to be good option" (*id.*), as there were physical constraints due to the steep topography of the land and how big the detention pond would need to be. (*Id.*). Dr. Schoel also noted regulatory approvals would have to be obtained, such as obtaining a permit from the Corps of Engineers. (*Id.* at 28, 92).

After Mr. Winther's rejection of the stream armoring, Dr. Schoel testified that the solution they settled on was rerouting the water from Tributary 1 into Tributary 2, which he thought was a reasonable approach. (*Id.* at 44, 95). Dr. Schoel further testified that when the decision was made to reroute stormwater from Tributary 1 to Tributary 2, there was nothing in the design to capture sediment or erosion from Tributary 2. (*Id.* at 103). Dr. Schoel testified that, after the rerouting was implemented, Schoel and U.S. Steel were put on notice that there was an erosion problem in Tributary 2. (*Id.* at 104). Dr. Schoel testified that after they were made aware of this issue, there were no recommendations made to add any sort of device that would capture sediment, erosion, rocks, or riprap before it left The Preserve property. (*Id.* at 105). Dr. Schoel further explained that there is nothing to stop boulders and riprap and rocks from leaving The Preserve property, and the water flow in Tributary 2 was strong enough to move riprap. (*Id.*). Dr. Schoel testified that based on his education and experience, he did not think the development of The Preserve resulted in increased flows in Hurricane Branch (*id.* at 35-36), he did not think redirecting flows from Tributary 1 to Tributary 2 impacted Hurricane Branch as it travels through the Winther Property (*id.* at 44-45), and he did not think The Preserve caused any material damage to the Winther Property. (*Id.* at 54).

At the conclusion of the trial, the jury found for Plaintiffs on their channelization, trespass, and nuisance claims. (Doc. # 171). The jury returned a verdict in favor of Plaintiffs and against U.S. Steel in the amount of $235,150 in compensatory damages by comparing the fair market value of the Winther Property before ($401,700) and after ($166,500) the harm. (*Id.* at 4).

The motions addressed in this Memorandum Opinion were then filed.

## II.     Standard of Review

### A.     Renewed Motion for Judgment as a Matter of Law under Rule 50(b)

In reviewing a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, the court draws all reasonable inferences in favor of the non-moving party, may not weigh the evidence or make any credibility determinations, and disregards any "evidence that the jury need not have believed." *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 948 (11th Cir. 2018); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.") (citation and quotation marks omitted).

The "court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). In considering the sufficiency of the evidence, "'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.'" *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1560 (11th Cir. 1995)). A court should only "'render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Progressive Emu Inc. v. Nutrition & Fitness Inc.*, 787 F. App'x 549, 556 (11th Cir. 2019) (quoting *Gowski v. Peake*, 682 F.3d 1299, 1310-11 (11th Cir. 2012) (in turn citing Fed. R. Civ. P. 50)); *see also Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010) ("Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate only if the facts and inferences point [so] overwhelmingly in favor of one party . . . that reasonable people could not arrive at a contrary verdict."); *Christopher v. Florida*,

14

449 F.3d 1360, 1364 (11th Cir. 2006) (holding that the court must deny a motion for judgment as a matter of law "if there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.").

"District courts seldom enter a judgment as a matter of law, for it is appropriate only when there can be but one reasonable conclusion as to the verdict." *Thomas v. Broward Cnty. Sheriff's Off.*, 71 F.4th 1305, 1312 (11th Cir. 2023) (cleaned up). That is, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310 (11th Cir. 2019) (cleaned up). The court may "not second-guess the jury or substitute [its] judgment for [the jury's] judgment if [the jury's] verdict is supported by sufficient evidence." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 811 (11th Cir. 2020) (cleaned up).

### B.    Motion for New Trial under Rule 59(a)

The court may grant a motion for "a new trial on all or some of the issues . . . for any reason for which a new trial has . . . been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "New trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great – not merely the greater – weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312-13 (11th Cir. 2013) (cleaned up). The court may also grant a new trial under Rule 59 if the "damages are excessive, or . . . the trial was not fair . . . and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).

### C.    Motion for Injunctive Relief

As the Eleventh Circuit explained in *RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, "[i]t appears to be an open question in this Circuit whether, in a diversity case, federal or state law governs the issuance of a permanent injunction." 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024). But, consistent with the Eleventh Circuit's observation in *Crown Castle*, here, "because the application of either [Alabama] or federal law is not determinative, [the court] need not decide that issue here." *Id.* In other words, because the standards under Alabama and federal law are the same, which body of law applies is not dispositive. Both standards emphasize that injunctive relief may be granted only when a plaintiff would otherwise suffer irreparable harm and legal remedies would be inadequate. *See Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); *Hill v. Rice*, 67 So. 2d 789, 793 (Ala. 1953) ("Injunction is in much a discretionary remedy to prevent substantial injury where no adequate remedy at law obtains."). Both the Alabama and federal standards utilize a similar test. For instance, the Supreme Court has established the following test for an award of a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Alabama courts use the following test:

> To be entitled to a permanent injunction, a plaintiff must demonstrate success on the merits, a substantial threat of irreparable injury if the injunction is not granted, that the threatened injury to the plaintiff outweighs the harm the injunction may

cause the defendant, and that granting the injunction will not disserve the public interest.

*State v. Epic Tech, LLC*, 323 So. 3d 572, 585 (Ala. 2020).

Under both Alabama and federal law, courts have broad discretion in deciding whether to award injunctive relief. *See Lott v. City of Daphne*, 624 So. 2d 544, 545 (Ala. 1993) ("Injunctions are rarely a matter of right, and when an injunction is sought, the trial court is vested with broad discretion."); *LaMarca v. Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993) ("While district courts have broad discretion to fashion equitable relief, such relief must target the existing wrong.").

### III.    Analysis

Below, the court considers the merits of U.S. Steel's and Plaintiffs' respective motions as well as each parties' responses to them.

### A.    U.S. Steel's Motion

#### 1.    Judgment as a Matter of Law

U.S. Steel argues that it is entitled to judgment as a matter of law because Plaintiffs failed to present sufficient evidence establishing the element of causation for each of their claims. (Doc. # 177 at 1). Specifically, U.S. Steel contends that in the absence of any expert testimony or facts showing U.S. Steel was the cause of the Plaintiffs' damages, Plaintiffs cannot succeed on their claims as a matter of law. (*Id.* at 3). In response, Plaintiffs argue that they presented legally sufficient evidence as to causation and expert testimony is not required for them to prove their claims. (Doc. # 183). So, the court must determine (1) whether expert testimony is required here and (2) if the jury's verdict against U.S. Steel is "supported by sufficient evidence." *Chaney*, 483 F.3d at 1227.

As a preliminary matter, to the extent that U.S. Steel argues that only expert testimony could provide sufficient evidence to establish causation, that argument misses the mark. As the

court has already concluded (several times), a lay witness may provide testimony regarding causation of damages. Despite this, U.S. Steel argues the opposite by cherry-picking the court's language in a prior order that dealt with U.S. Steel's Motion in Limine (Doc. # 127) regarding whether Mr. Winther could provide lay witness testimony as to causation. (*See* Doc. # 136 at 4-6). In their Motion (Doc. # 177), U.S. Steel argues:

> This Court has already found that "the cause of water-related damage to [Plaintiffs'] property is based on inference rather than first-hand observation," and that is not an inference that "results from a process of reasoning familiar in everyday life" but "from a process of reasoning which can be mastered only by specialists in the field."

(*Id.* at 3-4 (citing Doc. # 136 at 5)).

But, that argument misunderstands the court's point. What the court actually stated is this: "Though hard to distinguish in certain situations, 'lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field.'" (Doc. # 136 at 5) (citing *United States v. Holland*, 722 F. App'x 919, 928 (11th Cir. 2018) (in turn quoting Fed. R. Evid. 701 Advisory Committee's Note – 2000 Amendment)). The court granted U.S. Steel's Motion in Limine (Doc. # 127) to the extent that Mr. Winther was not permitted to testify regarding the cause of water-related damage to his property because his proposed testimony was "based on inference rather than first-hand observation." (Doc. # 136 at 5). The court then stated, "Any testimony provided by Mr. Winther must be limited to first-hand observations and personal knowledge." (*Id.*). So, the court's prior order was limited to Mr. Winther testifying as to causation based on his inferences.

In its Motion (Doc. # 177), U.S. Steel further argues, "Just as Mr. Winther was not qualified to offer an opinion on the subject, neither are lay jurors. Particularly, here, where the facts do not even conclusively support this inference, the absence of expert testimony dooms Plaintiffs' claims." (*Id.* at 4). But, U.S. Steel's argument misses the target as it misunderstands what lay

witnesses may testify to and what the role of a juror is. Non-expert witnesses may offer opinion testimony if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issues; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Therefore, the witnesses at trial were permitted to testify about what they perceived at the Winther Property and The Preserve as it relates to water flow, sediment, riprap, and debris. Perceptions of these conditions are well within the scope of testimony lay witnesses may offer under the Federal Rules of Evidence. *See id.* For instance, it does not require any scientific or technical expertise to be able to see large rocks in a streambed or how water flow can change from a trickle to a gush. Further, the jury was not tasked with evaluating only the witnesses' descriptions of the condition of Hurricane Branch. They also were shown videos and other visual evidence that was authenticated by witnesses at trial. And, to be clear, "juries, not experts, are the ultimate arbiters of causation, [thus,] a jury is free to consider witness perceptions (along with all the evidence) when determining causation." *Smith Lake Marina & Resort LLC v. Auto-Owners Ins. Co.*, 2017 WL 4167448, at *3 (N.D. Ala. Sept. 20, 2017). For all of these reasons, the court concludes that expert testimony was not required at trial for the jury to find for Plaintiffs on the element of causation as to each of their claims.

Next, the court specifically evaluates the element of causation as to each of the Winthers' claims that the jury found for them on: (1) common law water; (2) trespass; and (3) nuisance.

### i.    Common Law Water Claim

As to their common law water claim, Plaintiffs were required to show that (1) U.S. Steel diverted or channelized water onto the Plaintiffs' property and altered the status quo of the water flow; and (2) the Plaintiffs' property was substantially damaged as a result. *Schambeau Props., LP*

*v. Waffle House, Inc.*, 2012 WL 253441, at *2 (S.D. Ala. Jan. 26, 2012); *see also Sargent v. Lambert Constr. Co.*, 378 So. 2d 1153, 1155 (Ala. 1979). To determine whether a defendant diverted or channelized water, "[t]he proper test is whether or not by reason of that construction the surface water was changed from its natural flow and caused to be deposited on the complainant's property to his damage." *Id.* at *6 (citing *Sargent*, 378 So. 2d at 1155). Accordingly, the court's jury instructions on Plaintiffs' common law water claim stated the following: "To prevail on this claim, Plaintiffs have the burden of proving the following elements by a preponderance of the evidence: 1. U.S. Steel actually diverted or channelized water onto Plaintiffs' property, and altered the status quo of the water flow; and 2. Plaintiffs' property was substantially damaged as a result." (Doc. # 167 at 12). The court went on to explain:

> As to the first element, Plaintiffs must prove that U.S. Steel's actions channelized water from The Preserve on to their property, and if it were not for those actions water would have been scattered and diffused as it flowed onto Plaintiffs' property. That is, Plaintiffs must prove that U.S. Steel either collected the stormwater into an artificial channel and cast it onto Plaintiffs' property, or channelized its stormwater into a naturally occurring water course flowing through Plaintiffs' land and thus overtaxed the capacity of that water course. And, Plaintiffs must prove that because of these actions, more water flowed through Plaintiffs' property and at a greater velocity than it did before U.S. Steel's actions.

(*Id.* at 12-13).

At trial, the jury heard from several witnesses about both Tributary 1 and Tributary 2. As to Tributary 1, which is a naturally occurring water course, the jury heard Phillips testify that the development of The Preserve caused the amount of water discharged into Tributary 1 to increase, and that the development of The Preserve increased the amount of water being discharged onto the Winther Property. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 53). The jury also heard testimony from Dr. Connors, who testified as to how a development (like The Preserve) and deforestation can cause stormwater runoff, erosion, and the movement of sediment. (Unofficial Transcript from the morning of Sept. 17, 2024 at 8). Additionally, as part of the undisputed facts,

the jury heard that Mr. Winther complained to U.S. Steel, the City, the ADEM, and the Corps of Engineers, asserting that Tributary 1 was experiencing increased stormwater flows and erosion. (Doc. # 125 at 5).

As to Tributary 2, Phillips testified that the rerouting of the stormwater from Tributary 1 to Tributary 2 increased stormwater discharge into Tributary 2 and into Hurricane Branch. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 63). Additionally, Mr. Winther testified that the flow of water coming down Hurricane Branch steadily increased from 2014 going forward. (*Id.* at 127). Mr. Winther was also presented with a photograph at trial that depicted the Winther Property in its current condition; Mr. Winther testified that the flow of water in the photograph used to look more like a trickle of water. (*Id.* at 122).

In the face of all of the testimony at trial, U.S. Steel argues in its Motion that the undisputed facts stipulate that the installation of an undersized culvert in Hurricane Branch reduced "peak flows." (Doc. # 177 at 4-5); (*see also* Doc. # 125 at 3 (listing the undisputed facts)). But, U.S. Steel's reliance on this undisputed fact does nothing to negate the testimony that there was stormwater discharged onto the Winther Property. That is, although U.S. Steel attempts to rely on the reduction of "peak flows," in doing so it fails to account for the distinction between peak flows and the general stormwater that was discharged onto the Winther Property. While in reality peak flows may (or may not) have been reduced, the jurors still heard testimony indicating that stormwater discharge increased onto Plaintiffs' property.

Based on the photographic and video evidence at trial, combined with the testimony the jury heard, a reasonable juror could conclude that the development of The Preserve – along with deforestation that would occur as part of that development – increased stormwater runoff and that U.S. Steel either collected the stormwater into an artificial channel (Tributary 2) and cast it onto

Plaintiffs' property or that U.S. Steel channelized its stormwater into a naturally occurring water course (Tributary 1) flowing through Plaintiffs' land and overtaxed the capacity of that water, all through its actions developing The Preserve. And a reasonable juror could also conclude that because of U.S. Steel's actions (development of the Preserve), more water flowed through Plaintiffs' property and at a greater velocity than it did before U.S. Steel's actions.

For these reasons, because the jury had sufficient evidence from which it reached its verdict, U.S. Steel is not entitled to judgment as a matter of law on Plaintiffs' common law water claim.

### ii.    Trespass

Because "the Alabama Supreme Court has held that the channeling of surface water onto a lower proprietor's land will support an indirect trespass cause of action against the party responsible for the channeling," *Easterling v. Awtrey Bldg. Corp.*, 770 So. 2d 606, 609 (Ala. Civ. App. 1999), Plaintiffs asserted an indirect, rather than direct, trespass claim. To prove an indirect trespass claim, Plaintiffs were required to establish four elements: "(1) an invasion affecting an interest in the exclusive possession of his property; (2) an intentional doing of the act which results in the invasion; (3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and (4) substantial damages to the *res*." *Id.* (quoting *W.T. Ratliff Co. v. Henley*, 405 So. 2d 141, 145-46 (Ala. 1981)). The court's instructions to the jury were as follows:

> To prevail on this [trespass] claim, Plaintiffs must prove the following facts by a preponderance of the evidence:
>
> 1. U.S. Steel was responsible for an invasion affecting Plaintiffs' property;
> 2. U.S. Steel acted intentionally resulting in the invasion;
> 3. It was reasonably foreseeable that the act would result in an invasion of Plaintiffs' property; and
> 4. The invasion caused substantial damages to the property.

(Doc. # 167 at 13-14).

The jury heard Castleman's stipulation that off-site impacts from the development of The Preserve are unavoidable. (Doc. # 125 at 6). The jury also heard the stipulation that development of The Preserve is ongoing. (*Id.* at 2). With this background in mind, the jury heard testimony from multiple witnesses about erosion and limestone riprap on the Winther Property.

The jury first heard testimony from Rawson, the previous owner of the Winther Property. Rawson testified that from 1991 until 2007 (when Plaintiffs bought the property), there were no significant changes to the property (Unofficial Transcript from Sept. 16, 2024 at 62), nor any riprap. (*Id.* at 86). The jury also heard Rawson testify as to his recent visit to the Winther Property, which was two days before trial. Rawson testified that there were "boulders all over the place, piles of silt . . . ." (*Id.* at 63).

The jury also heard from Dr. Connors, who visited the Winther Property on four separate occasions: in May and August 2019, in August 2022, and on September 16, 2024 (the day before he testified at trial). (*Id.* at 9). Dr. Connors testified that when he visited the Winther Property in 2019, he did not see any riprap, but when he visited the property in 2022, he saw riprap. (*Id.* at 17). And when Dr. Connors visited the property the day before he testified at trial, he testified that he saw "significantly more" rocks on the property than he did in 2022. (*Id.* at 33). Dr. Connors also testified that the riprap depicted in a photograph of the Winther Property is not native to the Winther Property. (*Id.* at 33). Dr. Connors also testified about the erosion he saw on the Winther Property, as well as how a development (like The Preserve) and deforestation can cause stormwater runoff and erosion. (*Id.* at 8).

Sapp also testified about the erosion of the streambed on the Winther Property (*id.* at 59), as well as the riprap in the streambed. (*Id.* at 60). However, he testified that he did not know how the riprap got there. (*Id.*). In addition, the jury heard from Phillips, who testified that he thought a

potential cause of the erosion was discharge from The Preserve. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 51). Phillips also testified that while Schoel designed riprap to go into the walls of Tributary 2, Schoel did not intend for riprap to go into the streambed. (*Id.* at 68).

The jury also heard from Mr. Winther. He testified that he noticed a change in the types of things coming downstream at Hurricane Branch, explaining that "sticks and branches" became "trees, big things." (*Id.* at 128). Mr. Winther also testified that he started to notice debris coming downstream, which he labeled as "odd construction debris" consisting of buckets, nets, and silt fences. (*Id.*). Mr. Winther also testified that he saw riprap on his property in 2021, and that the riprap was large, describing it "as big as your head." (*Id.* at 21). He testified that he had not seen riprap on his property as large as that prior to 2021. (*Id.* at 22).

Dr. Schoel also testified that there is nothing to stop boulders, riprap, and rocks from leaving The Preserve property, and the water flow in Tributary 2 can be strong enough to move them. (Doc. # 189 at 105).

In addition to the testimony heard at trial, the jury viewed photographic and video evidence where riprap was identified in the streambeds running through the Winther Property. And, during his testimony at trial, Mr. Winther presented various photographs and videos depicting his property. He testified to the jury about what was seen in the photographs: turbulent flow, material being carried downstream, and sediment being deposited. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 119, 126).

Although no witness was able to say exactly where the limestone riprap came from, witnesses did testify that riprap was (1) not native to the Winther Property, and (2) it was used in the development of The Preserve. A reasonable jury could thus infer then that U.S. Steel, when developing The Preserve, used limestone riprap, which then flowed through Tributary 1 or

Tributary 2 and ended up on the Winther Property. Based on the testimony the jurors heard at trial, they could find that U.S. Steel, in its construction of The Preserve, caused riprap and construction debris to enter Plaintiffs' property.

Because the jury had sufficient evidence to reach its verdict, U.S. Steel is not entitled to judgment as a matter of law on Plaintiffs' trespass claim.

### iii.    Nuisance

Under Alabama law, a nuisance is defined as:

> anything that works hurt, inconvenience, or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of fastidious taste, but it should be such as would affect an ordinary reasonable man.

*Russell Corp. v. Sullivan*, 790 So. 2d 940, 951 (Ala. 2001) (quoting Ala. Code § 6-5-120 (internal quotations omitted)). "'The essence of private nuisance is an interference with the use and enjoyment of land. [] So long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance to the enjoyment of property may amount to a nuisance.'" *Morgan Cnty. Concrete Co. v. Tanner*, 374 So. 2d 1344, 1346 (Ala. 1979) (quoting W. Prosser, *Handbook of the Law of Torts* Section 89, at 591-93 (4th ed. 1971)).

In its instructions to the jury, the court stated the following:

> To prevail on this claim, Plaintiffs have the burden of proving the following elements by a preponderance of the evidence:
>
> 1. Defendant caused a condition that caused Plaintiffs to lose the use or enjoyment of their land;
>
> 2. The condition would have affected an ordinary, reasonable person; and
>
> 3. The condition caused Plaintiffs hurt, inconvenience, or harm.

(Doc. # 167 at 16). The court further explained, "As to the first element, Plaintiffs must prove that U.S. Steel caused sediment, rock, or debris to be deposited onto Plaintiffs' property." (*Id.*). As to

the second element, "Plaintiffs must prove that the presence of this sediment, rock, or debris would affect an ordinary, reasonable person – not a fussy, picky, difficult, or hard to please person." (*Id.*). And finally, "As to the third element, Plaintiffs must prove that the presence of this sediment, rock, or debris actually caused them hurt, inconvenience, or harm, and as a result, Plaintiffs lost the use or enjoyment of their land." (*Id.*).

Plaintiffs presented sufficient evidence at trial for a jury to conclude that U.S. Steel is liable under Plaintiffs' nuisance claim. For example, the jury heard testimony from multiple witnesses who testified that they observed sediment on the Winther Property. The witnesses who testified as to the sediment on the Winther Property were Rawson (Unofficial Transcript from Sept. 16, 2024 at 63) and Mr. Winther (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 119, 126). Additionally, Macek testified that he observed sediment from The Preserve in Hurricane Branch and sediment leaving The Preserve being deposited on adjacent property in 2014. (*Id.* at 84-85). Dr. Connors also testified how a development (like The Preserve) and deforestation can cause the movement of sediment, and he testified to seeing more sediment on the Winther Property in 2022 than what he observed in 2019. (Unofficial Transcript from the morning of Sept. 17, 2024 at 8).

When considering this testimony together and viewing the photographic and video evidence presented at trial, a reasonable jury could conclude that U.S. Steel created a nuisance on the Winther Property by developing The Preserve and allowing sediment to be carried downstream onto the Winther Property. Therefore, there was sufficient evidence from the testimony and evidence at trial for the jury to conclude that U.S. Steel was liable under a nuisance claim.

For all of these reasons, U.S. Steel's Renewed Motion for Judgment as a Matter of Law (Doc. # 177) is due to be denied.

B. **Plaintiffs' Motions**

1. **Motion for a New Trial**

Plaintiffs argue that they are entitled to a new trial on their wantonness claim. The court granted U.S. Steel's motion for judgment as a matter of law on this claim at the close of all the evidence. Therefore, the jury did not consider Plaintiffs' claim for punitive damages. (Doc. # 178 at 3). Specifically, Plaintiffs assert that they are entitled to a new trial based on the following rulings: (1) the court's grant of U.S. Steel's motion for judgment as a matter of law on the issue of wantonness and punitive damages; (2) the court's exclusion of all inspection reports, notices of violation, and consent orders (and any references thereto) at The Preserve by the ADEM and the City; (3) the court's grant of U.S. Steel's motion to exclude Plaintiffs' expert testimony of Chris Johnson; and (4) the court's grant of U.S. Steel's motion to exclude some of Plaintiffs' proffered expert testimony of Dr. Connors. (*Id.* at 1).

In assessing whether Plaintiffs are entitled to a new trial, the court must determine some error occurred that caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')." *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). And, to be clear, errors that do not affect a party's substantial rights are not grounds for a new trial.[2]

With these standards in mind, the court considers each of Plaintiffs' grounds for asserting that they are entitled to a new trial.

---

[2] Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground  for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

i.        The Court's Grant of U.S. Steel's Judgment as a Matter of Law

Plaintiffs contend that the court's ruling on U.S. Steel's judgment as a matter of law at the

close of all the evidence as to wantonness was erroneous and likely affected the outcome at trial.

(Doc. # 178 at 6). Federal Rule of Civil Procedure 50(a)(1) states in relevant part:

> If a party has been fully heard on the issue during a jury trial and the court finds
> that a reasonable jury would not have a legally sufficient evidentiary basis to find
> for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
> (B) grant a motion for judgment as a matter of law against the party on a claim or
>       defense that, under the controlling law, can be maintained or defeated only with
>       a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). The Eleventh Circuit's standard governing Rule 50 motions for judgment

as a matter of law is well established:

> If the facts and inferences point so strongly and overwhelmingly in favor of one
> party that the Court believes that reasonable men could not arrive at a contrary
> verdict, granting of the motion is proper. On the other hand, if there is substantial
> evidence opposed to the motions, that is, evidence of such quality and weight that
> reasonable and fair-minded men in the exercise of impartial judgment might reach
> different conclusions, the motions should be denied, and the case submitted to the
> jury . . . [I]t is the function of the jury as the traditional finder of the facts, and not
> the Court, to weigh conflicting evidence and inferences, and determine the
> credibility of witnesses.

*Harris v. CVS Caremark Corp.*, 2014 WL 773717, at *1-2 (citing *Lipphardt v. Durango

Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (in turn quoting *Watts v. Great

Atl. & Pac. Tea Co.*, 842 F.2d 307, 309-10 (11th Cir. 1988) (per curiam))).

After careful review, the court concludes that Plaintiffs' substantial rights were not affected

by the court's ruling on U.S. Steel's motion for judgment as a matter of law as to wantonness.

Plaintiffs utterly failed to present evidence of wantonness at trial. Nevertheless, they ask the court

today to turn back the clock and infer from the testimony and evidence presented at trial that there

was in fact evidence presented to support a wantonness claim. The court was not persuaded then.

And, it (again) finds that dismissing this claim was appropriate. For one, in Plaintiffs' opening statement, Plaintiffs presented their claims as follows: "We've made claims for trespass, [] negligence, nuisance, and what the Court will explain to you at some point a common law water claim." (Unofficial Transcript of Sept. 16, 2024 at 20). Moreover, even before Plaintiffs rested their case, the court gave Plaintiffs fair notice, noting that no evidence of wantonness had been offered:

> The other thing I'm keeping my eye on is wantonness. I'm not sure I've heard any wantonness. I mean, I think we've heard evidence that they had a problem, they were trying to deal with the problem. Wantonness is not a subset of – is not a super duper negligence claim, it's a separate claim. So you might want to be thinking about – on both sides [about] wantonness does and does not go to the jury; okay?

(Unofficial Transcript from the morning of Sept. 18, 2024 at 8-9). Despite this warning by the court, Plaintiffs did not present any further evidence of wantonness before they rested their case.

"To hold a defendant liable for wanton conduct in Alabama, a plaintiff must establish a high degree of culpability. While negligent conduct is characterized by inattention, thoughtlessness, or heedlessness and a lack of due care, wantonness is characterized by a conscious act." *Craft v. Triumph Logistics, Inc.*, 107 F. Supp. 3d 1218, 1220 (M.D. Ala. 2015) (internal citations and quotations omitted). "Wantonness is willful misconduct undertaken with the knowledge that the likely or probable result will be injury, that is, with a *conscious* disregard for the rights or safety of others." *Id.* at 1220-21. "Wantonness can also be established by *reckless* disregard for the rights or safety of others." *Id.* at 1221 (citing Ala. Code § 6-11-20(b)(3)). As the court in *Craft* stated, "Alabama courts will allow a jury to determine whether conduct was wanton if there is any evidence that would allow that determination." *Id.*

Plaintiffs argue that because the issues Mr. Winther complained about did not improve, U.S. Steel acted wantonly. However, the jury heard from multiple witnesses about U.S. Steel's efforts to satisfactorily resolve Mr. Winther's complaints. And this testimony was unrebutted. U.S.

Steel attended a meeting with Mr. Winther, Schoel, the City, and the ADEM, where they discussed Mr. Winther's concerns. (Doc, # 125 at 5). At this meeting, they presented a solution to Mr. Winther, which was the stream armoring proposal. (*Id.*). But Mr. Winther rejected that. (*Id.*). So, with that in mind, U.S. Steel presented an alternative solution to address Mr. Winther's concerns, which was a partial rerouting of the stormwater discharge from Tributary 1 into Tributary 2. (Doc. # 187 at 84-85). Dr. Schoel testified that this solution was a reasonable approach. (Doc. # 189 at 44, 95). Nonetheless, Plaintiffs argue that because U.S. Steel did not implement a detention pond, they have somehow acted wantonly. (*See* Doc. # 178 at 13 ("U.S. Steel elected not to incorporate detention ponds in its stormwater design. The jury heard testimony of the benefits of detention ponds . . . .")). But, Plaintiffs' argument overlooks Dr. Schoel's testimony. He testified that the detention pond would not have solved Plaintiffs' issues. (Doc. # 189 at 27). To be clear, the court is not taking Dr. Schoel's testimony at face value. Rather, his undisputed testimony shows two things: (1) Defendant was exploring a number of ways to remedy the water issues; and (2) they were discussing those ideas with Mr. Winther.

There is another defect in Plaintiffs' argument, and this is the main one. Even though the jury heard testimony about detention ponds, there was no evidence to show that the implementation of a detention pond would have solved Plaintiffs' problems. Thus, it cannot be said that U.S. Steel acted wantonly for not implementing one possible solution, particularly one that at the time experts were telling them would not work.

The court correctly granted U.S. Steel's motion for judgment as a matter of law as to wantonness because there was no "substantial evidence opposed to the motion[]" to suggest that U.S. Steel acted wantonly. *Harris*, 2014 WL 773717, at *1. This was a negligence case – not a wantonness case.

Although the court concludes afresh that Plaintiffs failed to present evidence at trial to support a claim of wantonness, in order to be comprehensive, the court also addresses Plaintiffs' other arguments regarding the court's evidentiary rulings. Plaintiffs contend that these evidentiary rulings are additional grounds for a new trial because "[i]f this evidence had been admissible, . . . this evidence would *also* have supported wantonness and punitive damages." (Doc. # 185).

ii. **The Court's Exclusion of Chris Johnson's and Dr. Connors's Expert Testimony**

The court has already addressed the admissibility of Johnson's and Dr. Connors's testimony in a previous Memorandum Opinion and Order (Doc. # 123), Plaintiffs now assert that they are entitled to a new trial because the court "gutted" Johnson's and Dr. Connor's expert testimony. (Doc. # 185 at 5). But, that assertion cuts no ice at all.

In the interest of brevity and because the court already addressed the exclusion of Johnson's and Dr. Connors's testimony, the court will summarize why it determined Johnson's and Dr. Connors's expert testimony should be excluded.

As to Johnson, the court determined that "his opinions about (1) the source of the foreign materials in Hurricane Branch and on Plaintiffs' Property, (2) the volumes of storm water runoff, and (3) his testimony about the Consent Order," were due to be excluded. (Doc. # 123 at 15). The court reached this conclusion because he did not employ a sufficient methodology to support his opinions and his testimony was "internally inconsistent." (*Id.* at 13). Johnson opined that the riprap and other debris observed in Hurricane Branch and on Plaintiffs' property originated at The Preserve, yet he did not perform any testing to determine if this was accurate (although he conceded that testing was possible). (*Id.*). The court appropriately exercised its gatekeeping function to exclude Johnson's expert testimony. *See McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) ("Rulings on admissibility under *Daubert* inherently require the

trial court to conduct an exacting analysis of the proffered expert's methodology."). Plaintiffs argue that the court's exclusion of Johnson's testimony was in error. Plaintiffs do not point out how this alleged error affected their substantial rights to warrant a new trial though. They merely try to argue that Johnson "did perform calculations in his rebuttal, in which he developed a pre-development peak flow rate" (Doc. # 185 at 6) and he "relied upon documents from companies and individuals . . . ." (*Id.*). The court stands by its previous determination of this issue.

And, as to Dr. Connors, although he did testify at trial (albeit not as an expert), Plaintiffs now argue that the court's exclusion of his proposed expert testimony was error. In its Memorandum Opinion and Order (Doc. # 123), the court excluded Dr. Connors's proposed opinions about the source of the foreign material in Hurricane Branch and on Plaintiffs' Property and on the volumes of storm water runoff. (*Id.* at 19). The court found that Dr. Connors's testimony was not supported by a reliable methodology (*id.*) and that his opinions were based on a *post hoc ergo propter hoc* analysis. (*Id.* at 17). Plaintiffs argue that Dr. Connors used reliable methods as he "employed other methodologies including a common hydrological calculation . . ." (Doc. # 185 at 5). The court excluded Dr. Connors's expert testimony because Plaintiff had not established the reliability of his methodology. Plaintiffs have not shown this conclusion was error or that the exclusion of his expert testimony affected any "substantial right."

Of course, logic also explains why the exclusion of this proffered testimony was not error. Even without hearing it, based on other fact testimony presented at trial, the jury's verdict shows it found that debris from The Preserve entered Plaintiffs' property via the waterways at issue here. There obviously was not any substantial prejudice caused by the exclusion of this "evidence."

For all of these reasons, Plaintiffs have not shown how the exclusion of Johnson's and Connors' expert testimony has caused substantial prejudice or affected their rights to an extent that would warrant a new trial.

        **iii.**      **The Court's Exclusion of All Inspection Reports, Notices of Violation, and Consent Orders at The Preserve by the ADEM and the City**

In their Motion, Plaintiffs also argue that "[t]he exclusion of all ADEM documents, notices of violation (NOVs), and consent decrees, City of Hoover reports, and any reference thereto, was highly prejudicial to the Winthers and likely affected the outcome at trial." (Doc. # 178 at 15). Plaintiffs contend that this evidence would have supported a finding of wantonness. (*Id.*).

The court begins with a well-settled rule. "The admissibility of evidence is committed to the broad discretion of the district court, and the decision to exclude certain evidence will be reversed only upon a clear showing of abuse of discretion." *Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995). The court ruled on this evidence in its November 3, 2023 Memorandum Opinion and Order (Doc. # 123) and its July 8, 2024 Order (Doc. # 136). The court determined that this evidence was due to be excluded under both Federal Rules of Evidence 408 and 403. As to the consent decrees, the court found that Plaintiffs were precluded from using any consent decree between The Preserve and ADEM as evidence of Defendant's liability because the consent decree is a "compromise" within the meaning of Rule 408. (Doc. # 136 at 7). There were other problems with the introduction of this evidence. It likely is hearsay. That is, it would indicate that ADEM believed the Preserve was responsible. Also, as the court found, Plaintiffs failed to connect the consent decrees and NOVs to U.S. Steel's alleged conduct and Plaintiffs' alleged damages in this case. (*Id.* at 8). The court further determined that "even if Plaintiffs could show this evidence has some minimal probative value, that value would be substantially outweighed by the unfair prejudice to Defendant." (*Id.*).

Plaintiffs argue that that the materials should have been admitted because the ADEM inspections, NOVs, and consent orders reflect evidence of U.S. Steel's habit or routine practice under Federal Rule of Evidence 406. *See* Fed. R. Evid. 406 ("Evidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the habit or routine practice."). Plaintiffs contend that these materials are evidence "that U.S. Steel's routine practice was to disregard government-issued notices of permit violations." (Doc. # 178 at 17). This argument is meritless. The Preserve is a 325-acre development, and as U.S. Steel correctly notes, "the inspections at issue occurred over different seasons, during different weather events of varying severity and duration, were performed by different inspectors, involved a multitude of different erosion control practices under different sedimentation control plans, and to which there were a variety of responses from [U.S. Steel]." (Doc. # 181 at 5). Accordingly, it cannot be said that U.S. Steel has a habit of disregarding government-issued notices of permit violations. These materials due not constitute evidence of a habit or routine practice pursuant to Federal Rule of Evidence 406. Therefore, Plaintiffs' Motion for a New Trial based on the court's exclusion of these materials is due to be denied.

### iv. School's Knowledge Cannot be Imputed to U.S. Steel

In their Motion (Doc. # 178), Plaintiffs assert a new argument: Dr. School's knowledge can be imputed to U.S. Steel. (*Id.* at 14). This argument may be new, but it is dead on arrival.

In support of their argument, Plaintiffs assert that they "proffered evidence that U.S. Steel was guilty of participating in, authorizing, or ratifying the alleged wanton misconduct of School Engineering, and benefitting from its alleged misconduct." (*Id.* at 14-15). Plaintiffs go on to assert, "Therefore, School Engineering's knowledge can be imputed to U.S. Steel." (*Id.* at 15). Although this case has been litigated for the past seven years, this is the first time that Plaintiffs have alleged

School is an agent of U.S. Steel. Plaintiffs' Complaint contained no allegations to suggest School's knowledge or actions should be imputed to U.S. Steel. (*See* Doc. # 1-1). Moreover, no claims or allegations related to agency were made in fact or expert discovery, and this theory was not advanced in either the joint Pretrial Order (Doc. # 125) or proposed jury instructions (Doc. # 153) that were submitted to the court. Despite these failures, Plaintiffs argue that they are not alleging anything new in making this argument. (Doc. # 185 at 4). They contend that "School's testimony supported claims of U.S. Steel's wantonness" and "[t]hroughout this litigation, both parties have used evidence from School Engineering and its employees." (*Id.*). Although employees of School did testify at trial, there was no evidence presented that School was an agent of U.S. Steel. The court even discussed this issue when Plaintiffs raised their wantonness issue with the court:

> The Court: [W]hat I'm really trying to get you to [focus] on is Walter School is not U.S. Steel.
>
> Plaintiffs' counsel: He's their agent.
>
> The Court: He's somebody they relied on for his expertise.
>
> . . .
>
> The Court: I'm kind of wondering is agency even an issue in this case at this point? . . . I haven't heard that articulated in a pleading or in the pretrial order. . . .
>
> U.S. Steel's counsel: That has never been raised in the case, Your Honor.

(Unofficial Transcript from Sept. 19, 2024 at 84, 88).

Despite this conversation about agency, Plaintiffs now argue that School is an agent of U.S. Steel, and thus, School's actions and knowledge can be imputed to U.S. Steel. But, Plaintiffs have not submitted any evidence to suggest School was an agent of U.S. Steel. The court finds that Dr. School was merely an expert hired by U.S. Steel. The trial evidence revealed he was a vendor, not an agent. Plaintiffs' Motion for a New Trial on the grounds that School was an agent of U.S. Steel is due to be denied.

### 2.    Motion to Award Injunctive Relief

Finally, Plaintiffs argue that they are entitled to injunctive relief because "[m]onetary damages are an insufficient remedy due to the nature of U.S. Steel's trespass." (Doc. # 179 at 4). To support their argument, Plaintiffs contend that U.S. Steel has committed a continuous trespass because "[e]ven after the jury's verdict, U.S. Steel continues to discharge turbid water into Hurricane Branch which flows through [Plaintiffs'] property." (*Id.* at 5). Plaintiffs attached a photograph to their Motion, alleging that the photograph, taken September 25, 2024, "shows turbid water from Tributary 2 flowing into Hurricane Branch." (*Id.* at 2).

In their Motion, Plaintiffs argue that "[i]njunctive relief is a proper remedy for continuous trespass where actions at law may be inadequate . . . ." (*Id.* at 3). Plaintiffs cite the Alabama Supreme Court's holding in *Water Works & Sewer Bd. of the City of Birmingham v. Inland Lake Invs., LLC*, arguing that "The Alabama Supreme Court 'has stated repeatedly that it is "committed to the equitable right of injunction by the owner of land in possession when the trespass is of a continuous or repeated nature, so that actions at law would be inadequate."'" (Doc. # 179 at 3 (quoting *Inland Lake*, 31 So. 3d 686, 693 (Ala. 2009)). Plaintiffs argue that U.S. Steel should be ordered to "implement measures, including but not limited to detention ponds, to return the flow of stormwater from The Preserve to its predevelopment condition." (Doc. # 179 at 5). They contend that "[w]itnesses at trial testified regarding the benefits of detention ponds." (*Id.* at 4). They further argue that "Detention ponds capture stormwater and allow it to be discharged at slower rates. In addition, detention ponds allow sediment to settle out before being discharged, thus preventing or reducing the discharge of turbid water." (*Id.*).

In its response to Plaintiffs' Motion, U.S. Steel argues that Plaintiffs are not entitled to injunctive relief because Plaintiffs "were awarded full compensation for the permanent

nuisance/trespass claims they asserted here[,]" and "[a]ny further relief would be a windfall, and more fundamentally, the specific injunctive relief they request is beyond this Court's authority to do so." (Doc. # 182 at 1). U.S. Steel contends that the claim Plaintiffs presented at trial was a permanent nuisance/trespass claim, rather than continuous nuisance/trespass, and the measure of damages for a permanent nuisance/trespass claim is a diminution in value of the property. In fact, Defendants say this is precisely what Plaintiffs were awarded at trial. (*Id.* at 6). And, this award precludes any claims for injunctive relief. (*Id.* at 4).

In order to determine whether Plaintiffs are entitled to injunctive relief, the court begins with this question: Is Plaintiffs' trespass claim one for a continuous trespass or rather one for a permanent trespass? "Alabama has long accepted the dichotomy between permanent and continuous trespass, along with the factual distinctions incident to a determination of the appropriate measure of damages." *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 531 (Ala. 1979).

> If the injury is permanent, damages must be recovered for all time past, present, and future. The measure of damages means the difference in the fair market value of the property before and after the trespass . . . . If the nature of the injury is continuous . . . , the plaintiff can recover for the use of his property or its fair rental value. (Also, plaintiff may be able to recover the cost of restoration if this, plus rental value, is less than the diminution in value.) Any damages for future loss must be recovered in a later action if and when a subsequent trespass occurs.

*Id.*; *see also* Ala. Code § 6-5-217 ("Damages for continuous trespass are limited to those which have occurred before and up to the trial. Subsequent damages flowing from a continuance of the trespass give a new cause of action."). Courts typically grant injunctive relief for a continuing trespass because money damages may not be adequate. *See Town of York v. McAlpin*, 167 So. 539, 540 (Ala. 1936) ("[I]njunction is a proper remedy to restrain repeated or continuing trespasses where the remedy at law is inadequate because of the nature of the injury, or because of the necessity of multiplicity of actions to obtain redress."); *Hobbs v. Mobile Cnty.*, 72 So. 3d 12, 17

(Ala. 2011) ("It is recognized under Alabama law that an injunction is an appropriate remedy where the trespass is of a continuous or repeated nature.").

This is not a close question. Based on the damages that Plaintiffs sought and how they have phrased their trespass claim throughout this litigation, Plaintiffs' trespass claim is – and always was – one asserting a permanent trespass. And, because the trespass was permanent, rather than continuous, an injunction is both unnecessary and inappropriate because the damages Plaintiffs were awarded at trial were an adequate remedy.

Throughout this litigation, Plaintiffs have sought damages in the form of a diminution in value to their land, which suggests damages for a permanent trespass on their land. *See Borland v. Sanders Lead Co.*, 369 So. 2d 253, 531 (Ala. 1979). In October 2019, after U.S. Steel filed a motion for summary judgment based on their argument that Plaintiffs had presented no evidence of damages, Mr. Winther responded with an affidavit alleging that his property had diminished in value by $200,000. (Doc. # 27-3 at 3). And in October 2022, Plaintiffs disclosed a real estate appraisal expert, Dennis Key, who opined as to the Winther Property's "before" and "after" values. (Doc. # 92-18). Key calculated that the Winther Property's diminution in value was $253,600. (*Id.* at 7). And at trial, Key testified consistent with his report. Indeed, Plaintiffs introduced his report into evidence. (*See* Plaintiffs' Trial Exhibit 98). Additionally, Plaintiffs included in their Joint Proposed Jury Instructions the following: "The Winthers say U.S. Steel's conduct harmed their land, and the Winthers allege this harm is *permanent*. The measure of damage is the difference between the reasonable market value of the land immediately before the harm and the reasonable market value immediately after the harm." (Doc. # 153 at 29) (emphasis added). Based on these Joint Proposed Jury Instructions, the court included in its instructions to the jury the following: "Plaintiffs claim that they are entitled to recover compensatory damages for their loss in property

value based on their contention that U.S. Steel's conduct harmed their land. They allege this harm

is *permanent*." (Doc. # 167 at 21) (emphasis added).

Plaintiffs even highlighted the distinction between permanent and continuous trespass in

their motion to exclude the testimony of U.S. Steel's real estate appraisal expert, Scott Allen:

> In a tort action based on damage to real property, the proper measure of damages
> is the difference between the fair market value of the property before and after the
> damage. *See e.g., S.S. Steele & Co. v. Pugh*, 473 So. 2d 978, 982 (Ala. 1985); *IMAC
> Energy, Inc. v. Tittle*, 590 So. 2d 163, 168 (Ala. 1991). This black-letter rule applies
> to real property damage including permanent trespass but varies for continuous
> trespass whereby the plaintiff can recover for the use of the property or its fair rental
> value. *See Borland v. Sanders Lead Co.*, 369 So. 2d 523, 530 (Ala. 1979).

(Doc. # 93 at 3). Additionally, Plaintiffs recognized that an injunction would not be appropriate if

their trespass claim was one for a permanent trespass:

> If the Court determines that the trespass is continuous in nature, the Winthers are
> entitled to injunctive relief. . . . Alternatively, if the Court finds an injunction is not
> appropriate and the trespass is permanent, the measure of damages is the difference
> in the reasonable market value of the property immediately before and immediately
> after the injury.

(*Id.* at 3 n.1) (citations omitted).

For all of these reasons, the court finds that Plaintiffs' trespass claim was based on a

permanent trespass. Plaintiffs were awarded damages in the amount of $235,150, which is what

the jury found was the diminution in value to their land caused by U.S. Steel. (*See* Doc. # 167 at

21) (the court's instructions to the jury explaining how in order to determine "how much Plaintiffs

should recover as to their property value . . . the measure of damages is the difference between the

reasonable market value of the land immediately before the harm and the reasonable market value

immediately after the harm."). Because Plaintiffs were awarded damages for a permanent trespass,

and those damages were compensation for the diminution in value to their land resulting from that

permanent trespass, they may not also receive injunctive relief. The awarded damages have fully

compensated Plaintiffs for the diminution in value of their property; injunctive relief would only result in a double recovery to Plaintiffs.[3]

Because Plaintiffs were awarded full compensation for their permanent nuisance/trespass claim, they cannot also receive injunctive relief. Therefore, their motion for injunctive relief is due to be denied.

## IV.    Conclusion

For the reasons outlined above, U.S. Steel's Renewed Motion for Judgment as a Matter of Law (Doc. # 177) is due to be denied. Plaintiffs' Motion for New Trial (Doc. # 178) and Motion to Award Injunctive Relief (Doc. # 179) are due to be denied. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this February 25, 2025.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE

---

[3] And, even if Plaintiffs were entitled to injunctive relief (and, to be clear, they are not), the court would likely not have the authority to grant injunctive relief to Plaintiffs in the form of construction of a detention pond. The implementation of a detention pond requires a permit from the Army Corps of Engineers. (Unofficial Transcript from the afternoon of Sept. 17, 2024 at 55; Docs. # 187 at 40; 189 at 28, 92). The court cannot order that government entity to grant U.S. Steel a permit to implement a detention pond because the Army Corps is not a party in this litigation. *See United States of Am. v. Robinson*, 83 F.4th 868, 879 (11th Cir. 2023) ("[A] court may not enjoin a non-party that has not appeared before it to have its rights legally adjudicated."); *Killingsworth v. Thomas*, 2014 WL 3734100, at *5 (N.D. Ala. July 23, 2014) ("This court has no authority to order injunctive relief against a non-party.").